MADDOX, Justice.
This is an appeal from a judgment which construed certain terms of a contract. That contract and this litigation had their origin in the decision of the United States District Court for the Middle District of Alabama in Weissinger v. Boswell, 330 F.Supp. 615 (M.D.Ala.1974). That decision declared Alabama’s then existing property tax statutes unconstitutional and directed a statewide reappraisal program of all real property in Alabama.
The Alabama Legislature enacted legislation which delegated to the Revenue Department the authority to implement the reappraisal program, to employ qualified appraisers and to let any contract necessary to accomplish the reappraisal. Code 1975, § 40-7-60 et seq. Further, this legislation contained the following provision:
The department of the revenue may, with the approval of the governor, employ any appraisal firms employing a duly accredited member or members of the American Institute of Real Estate Appraisers as consultants to inspect the various systems of assessing in each county and to advise the department of revenue of the best procedures to be followed in the several counties so as to expedite the statewide reappraisal as required by law; provided, that any firms or appraisers hired by the state department of revenue or by local government shall be bona fide residents of the state of Alabama and shall have resided in the state for at least one year prior to January 19,1972. (Acts 1971, 3rd Ex.Sess., No. 160, p. 4404, § 6.) [Emphasis added.]
Code 1975, § 40-7-65.
At the Revenue Department’s direction, a uniform contract was prepared for use in each of the counties in the state m connection with the performance of the reappraisal. The uniform contract provided that compensation be paid to the contractor on a fixed-fee basis.
Problems were encountered by the Revenue Department and by the contractors throughout the state in performing the reappraisal work. Not a single reappraisal contract in the state was completed within the time specified in the agreements.
In 1977, the Revenue Department decided to take over the completion of the reappraisal work in Madison County and to enter into a new contract with a contractor to be selected. Bids were submitted by various contractors, including Johnston-Clark, an Alabama firm which was representing Cole-Layer-Trumble, an out-of-state firm. The bid was submitted by Johnston-Clark because of the language in Code 1975, § 40-7-65, which required the contract to be let to an Alabama appraiser. Nevertheless, the Revenue Department was fully aware that Cole-Layer-Trumble was to do the actual work; in fact, Cole-Layer-Trum-ble was engaged in reappraisal work in several Alabama counties.
The bid submitted by Johnston-Clark for complete mapping and reappraisal in Madison County provided for a fixed fee of $3,630,000, of which $1,780,000 was for the reappraisal work alone. Johnston-Clark was selected as the company with which the Revenue Department decided to negotiate a formal agreement; meetings were held between the representatives of the various parties involved. During these meetings, the Revenue Department advised the contractors that only reappraisal work would be required and that Johnston-Clark’s proposal of $1,780,000 for that work presented budgetary problems; therefore, discussions were held to determine if a method for compensation, other than fixed-fee, could be arranged.
An attorney for Cole-Layer-Trumble was instructed to draft a compensation provision in the new contract which would pro *1166 vide for an estimated fee not to exceed $1 million without the prior written approval of the Revenue Department. The final contract was entered into between Johnston-Clark and the Revenue Department on February 17,1978. Paragraph I-C of that contract, dealing with compensation, reads as follows:
In consideration of the Company’s furnishing the Department the services contracted for herein and such services meet the requirements of this contract and are approved by the Department, the Company shall receive from the Department an estimated fee not to exceed one million dollars ($1,000,000) without prior written approval of the Department. The Company will invoice in accordance with the Fee Schedule attached hereto and made a part hereof. All services performed under this contract will be charged in accordance with the Fee Schedule. Invoices will be rendered every four weeks to the Department and payable upon receipt. Department will have access to payroll records and all records related to billing at execution of this contract. [Emphasis added.]
Paragraph I-D of the agreement required a performance bond of $1 million. The bond was written in this amount, according to testimony by a representative of the surety, Ohio Casualty Insurance Company, based on the contract and because such performance bonds are always written with a specific amount stipulated, regardless of whether or not the contract is fixed-fee.
Shortly after the contract was executed, employees of Cole-Layer-Trumble began work in Madison County. The work progressed without substantial difficulty until the summer of 1978. Because of unexpected problems, additional time and work was necessitated which, of course, increased costs. In September or October of 1978, Cole-Layer-Trumble realized that there was a possibility that billings might exceed $1 million and immediately notified the Revenue Department of the possibility. This notification included a request to submit invoices in excess of $1 million.
The Revenue Department advised the contractors that it construed the contract as a “guaranteed maximum” fee of $1 million and refused to extend approval of a fee to exceed that amount. Johnston-Clark and Cole-Layer-Trumble, therefore, discontinued work under paragraph I-E--2 of the contract. At the time of cessation, Johnston-Clark/Cole-Layer-Trumble had incurred billings totaling $1,081,000. Subsequent to cessation, the Revenue Department completed the work in Madison County and, of course, incurred certain expenses as a result.
Johnston-Clark filed a declaratory judgment action against the Revenue Department asking the court to construe the contract and give approval to expenses in excess of $1 million. Johnston-Clark then amended its complaint seeking $172,571.82, plus interest, for unpaid invoices for work and services performed. Alleging a default, the Revenue Department counterclaimed and sought recovery of sums for completion of the work contracted for from Johnston-Clark, Cole-Layer-Trumble and Ohio Casualty Insurance Company.
In its final decree, the trial court found in favor of the Revenue Department and held that the compensation provision provided for a “cap” of $1 million. The court also found that Johnston-Clark’s refusal to complete work under the contract constituted a breach of the argument and awarded the Revenue Department judgment in the amount of $299,618.12 which represented the estimated cost of completion.
The appraisal company raises three issues on appeal: (1) whether the trial court erred in concluding, as a matter of law, that the contract provided for a guaranteed maximum fee of $1 million; (2) whether the trial court’s factual findings as to the intention of the parties were plainly and palpably erroneous; and (3) whether the trial court was in error in awarding judgment in favor of the Revenue Department on its counterclaim against the contractors.
The issue which is central to the disposition of this case is the construction of the following contractual language: “.. . the *1167 Company shall receive from the Department an estimated fee not to exceed one million dollars ($1,000,000) without prior written approval of the Department.”
Appellant argues that the words “estimated fee” are most significant and cites several decisions which appellant claims should be followed by this Court. Appellant relies heavily upon the decision in J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261 (Mo.1973), which was cited with approval by the Alabama Court of Civil Appeals in Vester J. Thompson, Jr., Inc. v. Citmoco Services, Inc., 371 So.2d 35 (Ala.Civ.App.1977), rev’d on other grounds, 371 So.2d 42 (Ala.1978).
Hathman held that the term “estimate” negates certainty and should be construed as indicative of a rough calculation. Other jurisdictions have reached a similar result. V. Mueller & Co. v. United States, 115 F.2d 354 (C.C.P.A.1940); Jones v. Pollock, 34 Cal.2d 863, 215 P.2d 733 (1950); Denniston & Partridge Co. v. Mingus, 179 N.W.2d 748 (Iowa 1970); State Highway Commission v. Board of Councilmen of City of Frankfort, 54 S.W.2d 315, 245 Ky. 799 (1932); and Syring-Workman, Inc. v. Colbert, 532 S.W.2d 708 (Tex.Civ.App.1976). These cases, relied upon by appellant, do stand for the proposition that the term “estimated fee” is unambiguous and should be construed as a mere estimate and nothing more.
The appellee, however, argues that to give such a construction would defeat the meaning of the term “not to exceed” which appears in conjunction with the term “estimated fee” in the contract. The United States Supreme Court, in Train v. City of New York, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975), decided that the term “not to exceed” is a definite qualifying term and that since this “definite qualifying” language is used in conjunction with the term “estimated fee” what is intended is really a “guaranteed maximum” or “ceiling price.” This argument is in line with the general rule of construction that language in a contract must be interpreted in light of the surrounding circumstances. United States Fidelity and Guaranty Corporation v. Elba Wood Products, Inc., 337 So.2d 1305 (Ala.1976); Obermark v. Clark, 216 Ala. 564, 114 So. 135 (1927).
It is, therefore, important to examine the surrounding circumstances as well as the totality of the language to be construed. The language under interpretation contains not only the terms “estimated fee” and “not to exceed,” but also, the term “without prior written approval.” The term “without prior written approval” appears to have been inserted into the contract as an escape valve. If the appraisers ran into difficulty and had to exceed $1 million and if the State had the money, then the Department could approve payments in excess of $1 million. This, however, does not appear to have been the case.
The circumstances surrounding the formation of this contract are many and varied. First, the Revenue Department had encountered difficulty through the contractors it had hired in performing 'the reappraisal work. In fact, not one of the reappraisal contracts was completed within the time allotted. The specific county wherein this particular contract arose, Madison County, had experienced such problems that the Revenue Department decided to take over the completion of the contract and removed the reappraisal work from the original contract. Competitive bids were sought by the Department and bids were submitted by various contractors. The one submitted by Johnston-Clark was the most acceptable to the Department.
The bid submitted by the appellants within this competitive bid situation was $1.78 million for the reappraisal work alone. The Revenue Department advised the appellants that the amount of that bid created budgetary problems for the Department. Thereafter, extensive negotiations occurred between the parties. During the course of these negotiations, Mr. Trumble, a representative of the appellants, indicated that the work could be completed for an amount around $800,000. Mr. Trumble testified concerning these discussions and stated:
*1168 Q. Were there any discussions at that meeting on what would be the expected or possible cost if it were done on a time and material basis?
A. Okay. We discussed ranges of prices from Eight Hundred, Eight Hundred and Fifty Thousand up. The basis for the Eight Hundred, Eight Hundred and Fifty Thousand prices were pointed out that if everything went smoothly, if the records were as clean as we had, in some cases, been led to believe and that if the time frame we were able to schedule the people in such a manner that we could get through the program, that we could possibly make it for somewhere in the Eight-Fifty range.
Q. Did you ever tell any of them at this meeting that you were guaranteeing that the contract that you would propose would ever exceed some sum certain?
A. I absolutely did not.
The logical construction which should be given the contractual language, especially in light of the surrounding circumstances, is that $1 million was an estimate of what the contractor felt the maximum cost of the work would be. The contract was limited to $1 million because of fiscal constraints on the State. The appraisers agreed to complete the work within their estimate unless the State agreed to allow them to exceed it. The State did not so agree and refused approval to exceed the $1 million contract price. The trial court, therefore, did not err in construing the contractual language.
If payments were not made to the contractor for work performed then the contractor had the right, under paragraph I-E-2 of the contract[1], to discontinue the services and work that it was performing under the contract. The trial court did not err in finding under Paragraph I-E-2 that the Department was entitled to a judgment of $299,618.12 because the appraisers ceased work which entitled the State to complete the work. This amount was reduced by $172,571.82, representing unpaid expenses to the contractor which would have brought the total paid to the contractor to $1 million, leaving a net judgment of $127,046.30 against the contractor. This finding is apparently based on the expenses incurred by the Department in completing the work. This finding is, therefore, without error based on paragraph I-E-2.
Therefore, the judgment of the trial court is due to be affirmed.
AFFIRMED.
TORBERT, C. J., and JONES, SHORES and BEATTY, JJ., concur.

. Paragraph I-E-2 of the contract reads as follows:
Before the contract may be declared in default, the Company and the surety company must be notified in writing by the Department of the conditions which make default of the contract imminent. Ten (10) days after this notice is given, if a satisfactory effort has not been made by the Company to correct the conditions, the Department may declare the contract in default and notify the Company accordingly. In case the contract is declared in default as above or terminated by the Department in accordance with paragraph E of this contract, the right is reserved for the Department to take possession of all work completed, work in progress, material, equipment and supplies as specified in paragraph H hereof, or any other part of the work, to account for said work and material to the Company and to use the same to complete, or have completed, the project in accordance with the same standards of requirements and rules and regulations under which this contract was executed and in accordance with the same standards set out in the provisions and specifications of this contract. The Company shall be firmly bound by the terms hereof, except it may discontinue the services and work which devolve upon it in the event payments to it, at no fault of the Company, are not made when due and as provided in this contract.