This case involves a class action suit brought by certain rural land owners in Montgomery County challenging the method used by the county tax assessor to determine current use valuation of land for ad valorem tax purposes as being contrary to the provisions of Amendment No. 373, Constitution of Alabama (1901) and Act No. 135, Acts of Alabama, 2nd Special Session, *Page 438 
1978.[1] We affirm the trial court's holding that the Montgomery County Tax Assessor assessed plaintiffs' land at fair market value instead of current use value and thus did not comply with Act No. 135, but we reverse in part and remand on other grounds.
To convey a fuller understanding of this case, we shall recount the recent history of ad valorem taxes in Alabama in general and in Montgomery County in particular. In Weissingerv. Boswell, 330 F. Supp. 615 (M.D.Ala. 1971), a three-judge federal panel held that the lack of uniformity in ad valorem taxes across Alabama violated the federal and state constitutions. The court concluded,
 "The Court is aware of the impact of the present decision upon the tax structure of the state and its subdivisions, since the type of discriminatory treatment here involved is deep-seated and of long standing. For these reasons, the Court will give defendant [commissioner of revenue] a reasonable period of time, up to one year from the date of this opinion and order, to bring assessments throughout the state into conformity with the mandate of this opinion. It is so ordered."
Id., at 625.
The Court below described the efforts of the Montgomery County Tax Assessor to comply with the order in Weissinger,supra, as follows:
 ". . . Montgomery County contracted with Cole Layer-Trumble, hereinafter referred to as `CLT', in 1975 to provide property maps for Montgomery County and to reappraise all real property. By statute, the assessed value placed on this real property was its `fair and reasonable market value'.[5]
 "CLT established a Rural Land Schedule for Montgomery which reflected three basic types of soil, designated A, B and C. These three types were further broken down into three subgroups each, i.e., A-1, A-2, A-3, etc. Further classifications were defined according to the location in the county and the type of road access to the property. By examining actual individual sales in each category, CLT determined the fair market value of the property in each corresponding category and listed them in a schedule. The dollar amounts were determined according to the testimony of Montgomery County appraiser Tommy Miller,[6] by what a willing buyer would pay a willing seller. He testified that the value sought was the fair and reasonable market value and that CLT inserted dollar values as reflected by actual sales in the market. This was unquestionably as required by the statute in effect at that time, § 40-7-15, supra, and the court finds that the Rural Land Schedule developed by CLT was based on fair market value.[7]
[5] § 40-7-15, Code of Alabama (1975); See also Monroe Bond andMortgage Co. v. State, 254 Ala. 278, 48 So.2d 431 (1950).
[6] Miller was employed by CLT during the reappraisal and was subsequently hired by Montgomery County in April, 1978, to implement the system CLT established.
[7] Higher values were assigned to agricultural and timberland that was within the `urban influence' of the City of Montgomery."
The trial court then set out the Rural Land Schedule, but we reserve it for a more pertinent point in the opinion, infra.
State-wide, the reappraisals ordered by the Weissinger court took considerably longer to complete than the one year contemplated by the federal court.[2] It became clear that many Alabama landowners' property taxes would increase significantly. In 1978, the Governor called the legislature into special session to avert the substantial increases in ad valorem taxes imminent under the new appraisals.[3] *Page 439 
Included in the governor's tax relief package was a proposed amendment to Section 217 of the Constitution of Alabama of 1901. It passed the legislature, was ratified by the people, and is now Amendment No. 373 to the Constitution of 1901. In pertinent part, it reads:
 "(a) On and after October 1, 1978, all taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation:
 "Class I. All property of utilities used in the business of such utilities.
"Class II. All property not otherwise classified.
 "Class III. All agricultural, forest and single-family owner-occupied residential property, and historic buildings and sites.
 "Class IV. All private passenger automobiles and motor trucks of the type commonly known as `pickups' or `pickup trucks' owned and operated by an individual for personal or private use and not for hire, rent or compensation.
 "(b) With respect to ad valorem taxes levied by the state, all taxable property shall be forever taxed at the same rate. On and after October 1, 1978, such property shall be assessed for ad valorem tax purposes according to the classes thereof as herein defined at the following ratios of assessed value to the fair and reasonable market value (except as otherwise provided in subsection (j) hereof) of such property:
"Class I. 30 per centum.
"Class II. 20 per centum.
"Class III. 10 per centum.
"Class IV. 15 per centum.
". . .
 "(j) Notwithstanding any other provision of this section, on and after October 1, 1978, taxable property defined in subsection (a) hereof as Class III property shall, upon application by the owner of such property, be assessed at the ratio of assessed value to the current use value of such taxable property and not the fair and reasonable market value of such property. The legislature may enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities establishing criteria and procedures for the determination of the current use value of any eligible taxable property and procedures for qualifying such property for assessment at its current use value. . . ." (Emphasis added.)
To implement this constitutional amendment, the legislature passed Act No. 135[4] in the above-mentioned special session. Act No. 135, set out in pertinent part below, provided for the appraisal of Class III property at current use value upon application by the property owner:
 "Section 4. Current use value. For ad valorem tax years beginning on and after October 1, 1978, with respect to taxable property defined . . . as Class III property and upon request by the owner of such property as hereinafter provided, the assessor shall base his appraisal of the value of such property on its current use on October 1 in any taxable year and not on its fair and reasonable market value. As used in this Act, `current use value' shall be deemed to be the value of eligible taxable property based on the use being made of that property on October 1 of any taxable year; provided, that no consideration shall be taken of the prospective value such property might have if it were put to some other possible use.
In determining the current use value of eligible taxable property, the assessor shall presume that there is no possibility of the property being used for any other purpose, as if there were a legal prohibition against its use for any other purpose. In determining the current use value for real property classified as agricultural or forest property, the tax assessor shall consider farm income, soil productivity or fertility, topography, susceptibility to flooding, rental value, replaceability as agricultural property for the production *Page 440 of food and fiber, and other factors which may serve to determine value for agricultural or timber production purposes, including any such factors that the department of revenue shall by regulation specify. The department of revenue shall, prior to May 1, 1979, prescribe all needful rules and regulations for the enforcement and implementation of this Section by the department and by the several county tax assessors and all other persons listed in Section 40-2-11 (1), Code of Alabama 1975, as being charged with any duty in the enforcement of tax laws.
"Section 5. Qualification procedure.
 "(a) Any owner of eligible taxable property described in Section 4 of this Act may apply to have such property assessed for purposes of ad valorem taxation at the appropriate ratio of assessed value to the current use value of such property by filing a written application, in form as prescribed by the department of revenue, with the tax assessor of the county in which such property is located, on and after October 1 but not later than January 1 in any taxable year.
 "(b) The application form for qualification of real property as agricultural property shall set forth a description of the real property, a general description of the use to which it is being put, and such other information as the tax assessor may require to aid him in determining whether the real property qualifies for assessment based on its current use value.
 "(c) The application form for qualification of real property as forest property shall include a description of the real property, a general description of the uses to which it is being put, aerial photographs, if available, and such other information as the tax assessor may require to aid him in determining whether the land qualifies for assessment based on its current use value.
 "(d) Any person aggrieved by the denial of any application for the qualification of eligible taxable property for assessment based on its current use value shall have the same rights and remedies for appeal and relief as are provided by law for taxpayers claiming to be aggrieved by the actions of tax assessors or boards of equalization.
 "(e) If the application for assessment of any taxable property based on its current use value is granted by the tax assessor, the owner of such property shall not be required to repeat the application for subsequent taxable years. Following the sale or other disposition of such property, the new owner thereof must apply for current use valuation for such property as provided in this Section; otherwise such property shall be assessed at its fair and reasonable market value. In the assessment book described in Section 40-7-33, Code of Alabama 1975, the tax assessor shall show, in addition to the other information specified therein, that the owner of taxable property eligible for current use valuation under this section has applied for and been granted current use valuation of that property for purposes of assessment." (Emphasis added.)
Although Act No. 135 directed the Department of Revenue to prescribe all rules and regulations needed to implement the overall act, the department failed to issue any guidelines or regulations by the May 1, 1979, deadline except to establish March 31, 1979, as a cut-off date for applications for current use treatment. As a result, the legislature responded with guidelines of its own in the form of House Joint Resolution No. 153, 1979 Ala. Acts 269 (hereinafter referred to as H.J.R. 153).[5]
 "WHEREAS, it is the sense of the Legislature that the method of appraisal of agricultural and forest property described in Exhibit 1 attached hereto and made a part hereof is consistent with the intent and purpose of the Legislature in proposing Amendment No. 373 to the people of *Page 441 
Alabama for their consideration and with the will of the people of Alabama expressed by their ratification of Amendment No. 373, and that the adoption by the State Department of Revenue of the aforesaid method of appraisal would fulfill the legislative mandate contained in Section 4 of Act No. 135 with respect to agricultural and forest property; and
 "WHEREAS, the Legislature finds that the application form set forth in Exhibit 2 attached hereto and made a part hereof would serve the purposes of the Legislature intended to be effectuated by the enactment of Act No. 135 with respect to agricultural and forest property; now therefore
 "BE IT RESOLVED BY THE LEGISLATURE OF ALABAMA, BOTH HOUSES THEREOF CONCURRING, That we recommend that the State Department of Revenue promulgate regulations adopting the method of appraisal of agricultural and forest property at its current use value described in the aforesaid Exhibit 1 and approving the application form set forth in the aforesaid Exhibit 2; and
 "BE IT FURTHER RESOLVED, That a copy of this resolution be sent to the Commissioner of Revenue.
"Approved May 31, 1979.
"Time: 4:00 P.M.
"EXHIBIT 1
 "CURRENT USE VALUATION OF AGRICULTURAL AND FOREST PROPERTY
 "Current use valuation of agricultural and forest property for purposes of Alabama ad valorem taxation shall be determined on the basis of ten soil groups (as determined by the Soil Conservation Service of the U.S. Department of Agriculture) and the net crop, pasture or timber income potential within each soil group. Current definitions of each soil group is [sic] attached to this exhibit as Appendix A. Landowners electing current use valuation shall have the current use value of their agricultural and forest property determined from the net income approach. The net income potential is determined by capitalizing potential net agricultural or forest income for each type of soil group. The current use value of a piece of property is therefore assumed to be the present worth of the net income property of that particular soil group will produce." (Emphasis added.)
Through H.J.R. 153, the legislature recommended that the current use value of agricultural and forest property be determined from a "net income" formula. This formula established ten soil groups along with a suggested net income per acre, the net income being capitalized at a percentage based on the most recent five-year average of the interest rates on long-term United States Government bonds.[6]
In the wake of H.J.R. 153, the Department of Revenue finally issued a regulation pursuant to the authority granted by Act 135. This regulation, dated June 1, 1979, extended the deadline for applications to June 15, 1979, and set forth the method to be used by tax assessors in determining the current use value of Class III property. It provided, inter alia, as follows:
 "5. METHODS AND PROCEDURES FOR DETERMINING CURRENT USE VALUATION
 "The following procedures and methods will be used by the tax assessor in determining the current use valuation of the following property for which a formal application has been filed:
 "a. Residential property which is being used exclusively as a single-family dwelling by the owner thereof. The current use value of such residential property will be an amount that will equal the current market value of such property.
 "b. Cropland, Pastureland and Timberlands — The method of determining *Page 442 current use value and assessed value thereon will be the method and values fixed by the Joint House Resolution No. 153. . . .
 "c. Historical buildings and Sites — Historical buildings and sites . . . will be valued according to current use as follows:
 "The improvement will be valued according to replacement method of similar residential or commercial properties not including architectural features which make it a significant landmark.
 "The land will be valued according to similar residential property or commercial property depending on the use of the historical building site as other similar property within the neighborhood. . . ." (Emphasis added.)
Just over a week later, however, on June 12, 1979, the commissioner issued another order which revoked all previous extensions of the application deadline and rescinded paragraph 5 (b) of the above regulation. The commissioner instructed the tax assessor of each county to revalue property involved in current use applications "in accordance with the provisions ofCode of Alabama, 40-7-25.1 using his discretion." This new regulation failed to set out any alternative to the net income method of H.J.R. 153. Accordingly, for the tax year ending September 30, 1979, county tax assessors were left with a short period in which to exercise their "discretion" and formulate a current use schedule.
In Montgomery County, tax assessor Marvin Driver worked with his chief appraiser, Tommy Miller, and established a "Current Use Schedule" within the brief time allotted. Under this schedule, parcels of land in Montgomery County containing ten acres or more and being used for agricultural, pasture, or forestry purposes were assigned a current use value taken from the following "Current Use Land Pricing Schedule," also formulated by Miller. The Current Use Schedule stated that "current use value and market value are one and the same."
 "CURRENT USE LAND PRICING SCHEDULE
 -------- --- ---- ------- --------
 1. Agriculture (cropland) A-1 . . . . . . 780.00/Ac. (Good)
 A-2 . . . . . . 720.00/Ac. (Avg.)
 A-3 . . . . . . 520.00/Ac. (Poor)
 2. Pastureland B-1 . . . . . . 500.00/Ac. (Good)
 B-2 . . . . . . 430.00/Ac. (Avg.)
 B-3 . . . . . . 300.00/Ac. (Poor)
 3. Forestry (timberland) C-1 . . . . . . 370.00/Ac. (Good)
 C-2 . . . . . . 290.00/Ac. (Avg.)
 C-3 . . . . . . 200.00/Ac. (Poor)
 4. Swamp 100.00/Ac.
Rural Land Schedule and Current Use Land Pricing Schedule are
one and the same."

As the trial court noted, each of these current use values was identical to the highest fair market value for the corresponding type of land as set out in Montgomery County's Rural Land Schedule. This schedule, mentioned above in connection with the Weissinger reappraisal, is as follows:
 "RURAL LAND SCHEDULE
 ------ ---- --------
 STATE PAVED CO. PAVED DIRT
 ZONE A ZONE B ZONE A ZONE B ZONE A ZONE B
 ---- — ---- — ---- — ---- — ---- — ---- —
 A-1 $600 $780 $500 $650 $450 $590
 ---
 A-2 550 720 450 590 400 520
 ---
 A-3 400 520 370 480 330 430
 ---
 B-1 380 500 350 460 320 420
 ---
 B-2 330 430 300 390 270 350
 ---
 B-3 230 300 200 260 180 230
 ---
 C-1 280 370 250 330 220 290
 ---
 C-2 220 290 200 260 180 230
 ---
 C-3 160 200 140 170 120 140"
 ---
 *Page 443 
Note that the figures in the "State Paved, Zone B" column are the same as the "current use values" in Miller's Current Use Land Pricing Schedule.
After Montgomery County implemented the above current use schedule, James Williams, Pat McIntyre, John Dees, and Morris Dees brought an action in the Circuit Court of Montgomery County on October 1, 1979, on behalf of themselves and all landowners who own rural Montgomery County land composed of cropland, pastureland, or timberland upon which ad valorem taxes are assessed. These plaintiffs claimed that the named defendants, officers and employees of Montgomery County and the State of Alabama, had illegally failed to comply with Act 135 by continuing to assess agricultural, pasture, and forest land in Montgomery County at fair market value.
The trial court found for the plaintiffs in the extensive and well-reasoned opinion from which excerpts are quoted herein and set out the following in the accompanying order: the defendants had illegally failed and refused to comply with Act 135; the value of agricultural and forest property in Montgomery County should be reassessed based upon the current use provisions of Act 135; each rural landowner should recover the amount of ad valorem taxes illegally collected; and the attorney's fees and costs should be paid out of the "pool of assets" created by the tax refund.
From this order and the final judgment thereon, the defendants now appeal. We shall first address the major issue of whether the appellants incorrectly applied Act No. 135.
I. Did the appellants illegally fail to comply with Act No. 135 in determining the current use value of agricultural and forest land in Montgomery County?
The trial court found:
 ". . . The Montgomery County Tax Assessor through his chief appraiser, Tommy Miller, established a Current Use Land Pricing Schedule without any assistance or advice from the Department of Revenue. Miller unilaterally determined that the current use value of rural farm and forest land in Montgomery County under Act No. 135 was identical to the fair market value of that land previously established by CLT and published as their Rural Land Schedule.
Miller's theory that current use and fair market value were the same was based on his conclusion that if land used for a certain agricultural purpose was sold for the fair market price of $750.00 per acre and, that after the sale the purchaser continued to use the land for the same agricultural purpose, this established the current use value of the land. . . .
 "The critical issue of this action is thus whether Section 40-7-25.1 Code of Alabama (1975), contemplated, as the defendants contend, that current use is the same as fair market value. To the court this appears to be largely a matter of statutory construction and must be resolved by reference to the Legislative intent of Act No. 135. . . .
". . .
 "In the instant case, the entire thrust of Act No. 135 was the structuring of the ad valorem tax around a standard based on the current use value of rural agricultural property. This represented a significant departure from prior law which focused on the fair market value of the property. Clearly, the Legislature intended to change the way rural farm property was to be appraised and taxed. Furthermore, it is also clear that fair market value and current use are not one and the same. To contend otherwise would render Section 40-7-25.1, supra, essentially meaningless and ignores the express wording of the statute.
 "`For ad valorem tax years beginning on and after October 1, 1978, . . . the assessor shall base his appraisal of such property on its current use on October 1 in any taxable year and not on its fair and reasonable market value. . . .' [Emphasis by the trial court.]
 "Why would the Legislature distinguish between the terms in this manner had not some difference been intended? *Page 444 
 "This position finds further support in that House Joint Resolution No. 153 indicates an intent by the Alabama Legislature, first, that current use value is different from fair market value; second, that current use values would be substantially lower than fair market value; and, third, that emphasis be given to considering the income produced by the land in calculating current use. The resolution further recommends the use of a capitalization or discount rate equal to `. . . the most recent five-year average of the interest rates on long-term United States Government bonds, as reported in the Federal Reserve Bulletin.' The Court finds this House Joint Resolution of particular relevance inasmuch as its sponsors were some of the same legislators who sponsored Act No. 135 and because of the relatively brief period of time between the passage of Act No. 135 and the resolution.
 "Miller testified that he wrote and published a guideline for taxpayers applying for current use valuation entitled the Montgomery County Current Use Schedule. . . . It provided in part that:
 "`Parcels which have already been appraised using the rural land schedules and classification, will not change, being that the current use value and market value are one and the same.'
 ". . . Miller then published a document entitled Current Use Land Pricing Schedule establishing dollar values for current use valuation of the same nine classes of land previously valued by CLT, except that the Miller schedule listed only one valuation per land type. . . .
". . .
 "Following Miller's preparation of his Montgomery County Current Use Schedule, he testified that he took it to the State Department of Revenue a few days prior to October 1, 1979, to show them what he was doing. On September 26, 1979, after Miller's visit, the Department of Revenue issued another Current Use Valuation Departmental Regulation. . . . Paragraph 5 (b) states, in part, that parcels that `have already been appraised using these [rural land schedules of the various appraisal companies] will not change since their current use value and market value are one and the same.' This is the identical language found in paragraph 4 of the Montgomery County Current Use Schedule prepared by Miller and shown to the Department of Revenue only a few days prior to the release of the Department's September 26, 1979, regulation. The court is inclined to believe from the evidence that this coincidental use of the same language was no accident and that the State Department of Revenue simply copied from the documents Miller drafted and delivered to them.
 "The court finds that the Montgomery County Tax Assessor through its appraiser made no attempt to assess property according to its current use value, but instead merely copied the highest fair market value of each of the nine classes of land from the Rural Land Schedule prepared prior to Act No. 135. See, supra, . . . Rural Land Schedule, column entitled `State Paved, Zone B'. It is clear to this court that the defendants failed to follow the plain meaning of Act No. 135. . . . The court finds that the Alabama Legislature intended from the passage of Act No. 135 to allow rural landowners a reduction in their ad valorem taxes by establishing a current use valuation which was lower than the fair market valuation. Expert testimony offered by the plaintiffs clearly established that the current use value of agricultural and forest land in Montgomery County, using the criteria listed within Act No. 135, would be much less than its fair market value. The plaintiffs' appraisal expert, O.G. Pinkston, who also had extensive experience as a farmer, testified that Act No. 135 limited what could be considered in arriving at a current use value. He noted that the language in the Act, which provides that the current use valuation should be made as if there were a legal prohibition against the use of the property for anything except the agricultural use to which it was being applied, is *Page 445 
similar to a restrictive covenant in a deed. He used as an example to illustrate the effect of such a restriction, a vacant city lot that restricted its use to a baseball field. This restriction would necessarily cause the value of such lot to be lower than a similar lot with no such restrictions. Both the defendants' and plaintiffs' experts agreed that many more factors are considered in arriving at the fair market value of rural land than just the income that can be gained from using the land for farming, pasture or timber production. The court finds that many factors affecting land value other than those set out in Act No. 135, are regularly considered by investors purchasing rural land in all parts of Montgomery County. These factors include anticipated appreciation, use of the land for rural home sites and investment as a hedge against inflation. Miller arbitrarily ignored the dictates of Act No. 135 and valued agricultural and forest lands in Montgomery not only at their fair market value, but at the highest fair market value according to the schedule prepared by CLT." (Footnote omitted; emphasis added.)
We find no error in the trial court's holding that the Montgomery County Tax Assessor, through his appraiser, drafted Montgomery County's "Current Use Land Pricing Schedule" by merely copying the nine highest fair market values from the "Rural Land Schedule" which was prepared and used for fairmarket value ad valorem assessment prior to Act No. 135. This being the case, current use value in Montgomery County would necessarily incorporate and include all the factors which had previously been considered in the computation of the fair market value of agricultural and forest land in Montgomery County.
The record reflects that one such factor previously considered in determining fair market value and now included within current use value, is the price that a willing buyer of agricultural or forest land would pay a willing seller of such land. The plaintiffs' expert, O.G. Pinkston, testified, however, and the trial court found, that the price between a willing buyer and seller, even of agricultural or forest land, will take into consideration other possible uses of the land such as uses for speculation, tax shelters, home sites, etc. As a result, the use of such a price for current use value directly contravened the express mandate of Act 135. Section 4 of the Act clearly states that "no consideration shall be taken of the prospective value such property might have if it were put to some other possible use . . . as if there were a legal prohibition against its use for any other purpose."
In addition, by deciding to simply copy figures off of the pre-current-use "Rural Land Schedule," those responsible for Montgomery County's ad valorem assessments were continuing to appraise agricultural and forest land using fair and reasonable market values. Yet, turning again to the language of Section 4 of Act 135, we find that it specifically prohibits substitution of fair and reasonable market value for current use value. "For ad valorem tax years beginning on and after October 1, 1978, . . . the assessor shall base his appraisal of the value of [Class III] property on its current use on October 1 in any taxable year and not on its fair and reasonable market value."
(Emphasis added.)
We quote again from the trial court's opinion to emphasize that Miller did not apply current use value as mandated by Act No. 135:
 "Faced with the striking similarity between the Rural Land Schedule prepared by CLT and his Current Use Land Pricing Schedule, Miller attempted to explain at trial that he did in fact use the criteria set forth in Act No. 135 to reach his current use valuations. He stated that one of the criteria Act No. 135 directed to be considered was farm income. Miller testified that since soybeans was the predominate crop for Montgomery County, he obtained from the Montgomery County Extension Service the recommended management practices for soybeans grown in the Black Belt region of Alabama. See Plaintiffs' Exhibit 8. Miller explained that this document listed a bottom *Page 446 
line `Net Return to Land and Management' of $87.66 per acre.[11] He testified that, while he knew the rate of return farmers expected on farm investments was 10 percent, he decided to capitalize this at 12 percent in order to give the farmers a break. The higher the capitalization rate, the lower the acre valuation. Using a 12 percent `cap' rate, Miller arrived at a current use value of $730.00 per acre for average row cropland. (A-2). From this, he computed his A-1 through A-3 row crop current use valuations of $780, $720 and $520. Had he used a cap rate of 10 percent he would have arrived at a current use valuation of $876.60 per acre. Miller also testified that he did not separate the profit to the land from the profit to the management because `the farmer and the land were one and the same.' Plaintiffs' expert testified, however, that the proper method was to capitalize only the return to the land. The court finds that Miller used the 12 percent capitalization rate and the inflated profit figure merely to create or force a figure that would produce a `current use' valuation similar or identical to the fair market value in CLT's Rural Land Schedule. Miller candidly admitted that the current use valuations he assigned to pastureland, B-1 through B-3, were arrived at by `analyzing sales of land used for pastureland.' For his current use valuation of forest land, C-1 through C-3, he testified that he simply examined sales of timberland, deducted the value of the timber, which is exempt from ad valorem tax, and calculated the price paid for the raw land. Based on the foregoing, the court finds that Miller did not apply the criteria set forth in Act No. 135 to determine current use value, but merely incorporated as his current use value the fair market value previously established by CLT.
[11] The parties stipulated that the agricultural economist from the Cooperative Extension Service at Auburn, who created the soybean management practice budget, would testify that the crop budget sheet used by Miller was for the Black Belt region and did not represent Montgomery County. The parties stipulated that the average soybean yield for the past five years for Montgomery County was in fact 21.4 bushels, not 30 bushels as used by Miller in computing his so-called `current use' values. This would mean that the contribution to land and management would be reduced by $55.90 ($6.50 per bushel times 8.6 less bushels) with a resulting total of $31.76 per acre. If this is capitalized at 12 percent, the current use valuation would be $264.67 per acre. If a 10 percent `cap' rate is used, the current use valuation would be $317.60. This compares favorably with the current use values determined for row cropland by the plaintiffs' expert."
This attempt by Miller to explain his schedule by reference to capitalization of income tacitly acknowledges that the method for determining current use value set out in H.J.R. 153 is consistent with the legislative intent expressed in Act No. 135, and that the method he used is not consistent with that intent. It is evident, therefore, that current use value was not determined in Montgomery County in accordance with the terms of Act No. 135. Substituting "fair and reasonable market value" for current use value was absolutely contrary to the directives of Act No. 135.
II. Were appellees who failed to apply for current use valuation proper parties in the action below?
The trial court, "upon plaintiffs' motion, certified this action as a class suit under Rule 23 (c)(2), the class being defined as:
 "All persons who own an interest in real property of ten (10) acres or more which is located within Montgomery County, Alabama, and which is utilized for agricultural purposes."
This delineation of the class comes directly from the county's current use schedule as set out above. We hold that the trial court erred by including property owners within the class without regard to whether they had applied for current use valuation.
Amendment 373, paragraph (j), provides that, on and after October 1, 1978, Class III property "shall, upon application bythe owner of such property, be assessed at the ratio of assessed value to the current use value of such taxable property and not the fair and reasonable market value of such *Page 447 
property." (Emphasis added.) Act 135 specifies that the assessor shall appraise Class III property at current use value"upon request by the owner of such property as hereinafter provided. . . ." (Emphasis added.) Thus both the Constitution and the statute clearly require application for current use treatment as a condition of the right to such treatment.
The trial court held that "[i]t would have been futile for a landowner to have requested current use valuation under Act No. 135 since defendants' procedures and price schedules precluded such treatment in advance of such application being made." This conclusion cannot be sustained, because the right to current use valuation depends upon a timely application therefor.
We agree with the holding in Cooper v. Board of Equalizationof Madison County, 392 So.2d 244 (Ala.Civ.App. 1980), that the right to current use assessment does not arise in a landowner who fails to timely file a request for current use valuation. As explained in Cooper, current use treatment is an exception to the rule of fair market valuation. Hence, of the landowners included in the class by the trial court, those who did not file for current use treatment never possessed the right to such treatment.
The result is that those landowners who did not file never possessed the very right which the action below sought to protect; therefore, they should not have been included as members of the class. The rule is well settled that to be a proper party plaintiff, a person must have an interest in the right to be protected. See, e.g., Bagley v. City of Mobile,352 So.2d 1115 (Ala. 1977). By the same reasoning, the named plaintiffs who did not apply had no right to relief.
The trial court's reliance on the futility doctrine is misplaced. Montgomery County did not publish the Current Use Schedule or the Current Use Land Pricing Schedule until after the June 15, 1979, deadline, which was the latest deadline for applications allowed by the Commissioner. Montgomery County landowners could not have known in advance that the tax assessor would assess Class III property at fair market value instead of current use value. Even if they somehow had known this, an application would have been a prerequisite to challenging the schedule, as discussed above.
Regarding the deadline beyond which applications were untimely, we find that the commissioner's June 12 order revoking all prior extensions was unreasonable. Act No. 135 required the commissioner to timely issue rules and regulations; the only such regulation timely issued was one extending the deadline for applications. Taxpayers would have been justified in relying on this and other extensions, so the commissioner cannot make these applications untimely after the fact.
III. Should the appellees who properly applied for current use treatment have been required to exhaust their administrative remedies?
The appellants argue that the trial court had no jurisdiction to hear this cause because the plaintiffs failed to pursue the statutorily-provided remedies for challenging tax assessments prior to instituting this action.
Section 5 (d) of Act 135 provides:
 "Any person aggreived by the denial of any application for the qualification of eligible taxable property for assessment based on its current use value shall have the same rights and remedies for appeal and relief as are provided by law for taxpayers claiming to be aggrieved by the actions of tax assessors or boards of equalization."
Code 1975, § 40-3-19, grants property owners a hearing before the county board of equalization to present objections to assessments or valuations of property. Sections 40-3-24 and -25 grant the right of, and the procedure for, appeal from the board of equalization's order to the circuit court. Sections40-7-45 through -48 grant a more general right of appeal from "any final assessment or valuation of property for taxation made by any officer, board, or commission. . . ." *Page 448 
Appellants cite such cases as City of Gadsden v. Entrekin,387 So.2d 829 (Ala. 1980), and Ex parte Board of Educ. ofBlount Co., 264 Ala. 34, 84 So.2d 653 (1955), for the proposition that failure to exhaust administrative remedies bars the appellees from bringing this suit. Appellees contend the doctrine of exhaustion of remedies does not apply in this case because they are challenging the assessment procedure employed by appellants as void and illegal. We agree that the method used in Montgomery County was illegal on its face, and thus the appellees were entitled to challenge the appellants' actions without exhausting their administrative remedies.
In Graves v. McDonough, 264 Ala. 407, 88 So.2d 371 (1956), the taxpayer sought a declaratory judgment that the comptroller should refund taxes paid on an erroneous assessment of property which the assessor deemed to have escaped assessment in previous years. This Court affirmed the judgment for the plaintiff:
 "First, we inquire whether there is any administrative method provided by law which appellee must have pursued to obtain a refund.
 "Section 53, Title 51 [Code 1940], provides that the tax assessor shall give notice of the escape assessment, and that such person may appear within twenty days and make objection to the assessment, and appeal to the circuit court from an adverse ruling. If no objection is made, the tax assessor shall make the assessment final. But we think the taxpayer by failing to object was not cut off from other remedies[7] which he may have had to contend that the assessment was void for want of legal authority, and to obtain a refund. The assessment is void under the authority of State v. Mortgage-Bond Co. of New York, [224 Ala. 406, 140 So. 365 (1932)]. Being void, the taxpayer was not required to pursue any certain remedy to get it so declared and obtain a refund. `The necessity for pursuing the statutory remedy does not exist where the assessment complained of is void and illegal.' 84 C.J.S. Taxation, § 513, Note 90.
 "`It is the general rule that a taxpayer seeking judicial relief from an erroneous assessment must have exhausted his remedies before the administrative body empowered initially to correct the error. . . . An exception is made when the attempted assessment is a nullity because the property is either tax exempt or outside the jurisdiction.' Security-First Nat. Bank v. Los Angeles County, 35 Cal.2d 319, 217 P.2d 946, 947; Bank of America Nat. Trust Savings Ass'n v. Mundo, 37 Cal.2d 1, 229 P.2d 345.
 "True, the Mortgage-Bond case, supra, merely affirmed on appeal the judgment of the circuit court without considering the necessity to appeal to the circuit court from such an assessment. We do not think that appellee was required to make objection to the tax assessor and appeal from the assessment as a condition to a contention that the escape assessment was illegal and without authority of law. 84 C.J.S. Taxation, § 513."
Id., 264 Ala. at 409, 88 So.2d 371. This Court followed the above reasoning and reached the same result in Thorn v.Jefferson County, 375 So.2d 780, at 788 (Ala. 1979). CompareCity of Gadsden v. Entrekin, 387 So.2d 829 (Ala. 1980), where it is observed that exceptions to the doctrine of exhaustion of remedies in zoning matters
 "generally arise where (1) the question raised is one of interpretation of the statute or (2) the action raises questions of law only and not matters requiring administrative findings of fact or an exercise of administrative discretion. In addition, administrative remedies need not be exhausted where doing so would be futile or where the remedies provided are inadequate. Likewise, one need not pursue *Page 449 
administrative remedies when irreparable injury is threatened."
Id., at 833, citing 101A C.J.S. Zoning and Land Planning § 281 (1979).
The appellees herein challenged the Montgomery County current use schedules as illegal applications of the current use law. The trial court held as follows:
 ". . . It is clear to this court that the defendants failed to follow the plain meaning of Act No. 135. The adoption of CLT's appraisal for current use under Act No. 135 contravenes the intent of the Legislative enactment and is clearly without statutory authority. Where, as here, the assessment complained of is void and illegal, the necessity for pursuing statutory administrative remedies is obviated. Thorn v. Jefferson County, [supra]; Graves v. McDonough, [supra]; 84 C.J.S. Taxation 513."
We agree with appellees and with the trial court that this case fits within the exceptions to the exhaustion of administrative remedies doctrine. Questions of law and of statutory construction preponderate over those of fact. The appellees challenged the county's application of the current use law in its entirety, not as it applies to particular pieces of property. Thus, the rationales for the exhaustion doctrine — protection of the courts from a multiplicity of suits, fact-finding and record-building by administrative bodies, etc. — do not apply to this action.
As explained under Issue I above, the Montgomery County current use schedules were indeed contrary to the legislative intent expressed in Act 135. Under the exceptions set out in the authorities cited above, the appellees need not have exhausted their administrative remedies instead of bringing this action.
IV. Was class action an appropriate mode of relief for the appellees?
Appellants contend that the trial court erred in certifying this action as a class action because questions of law or fact common to the members of the class do not predominate over questions affecting only individuals. Rule 23 (b)(3), A.R.Civ.P. We hold that the trial court correctly determined that a class action was superior to other available methods of adjudication and that the common burden of proving illegal the ad valorem tax assessment schedule predominated over any questions affecting only the individual appellees.
The appellees challenged the tax as it applied to all of Montgomery County, not as it applied to them individually. Reassessments of property belonging to class members would be merely administrative calculations, however, once the court decided the controlling common question of whether appellees properly applied Act 135. As the trial court observed,
 "Once the defendants adopt a current use land pricing schedule . . ., it will be a relatively simple matter to determine the current use valuation of any given piece of agricultural or forest land. The defendants have already created property cards on each rural land owner specifying the number of acres in each of the nine land type categories plus swampland. See Plaintiffs' Exhibit 7A. The defendants merely have to multiply the appropriate current use valuation from the new Current Use Land Pricing Schedule by the number of acres in the designated land type category. This can be done quickly in the office without any field work."
For this reason, a class action was proper, despite the fact that all the appellees were not identically situated. See,Thorn v. Jefferson County, surpa, in which this Court held that a class action was a permissible vehicle to restrain the enforcement of an invalid tax and to recover any taxes illegally paid.
We do note, however, that membership in the class should have been limited to those landowners who had filed for current use treatment. See discussion of Issue II above.
V. What relief is now available for the appellee landowners?
We find that the appellees who are properly in this cause (See Issues II III *Page 450 
above) are now entitled to have the county redetermine current use value of their land for those tax years in which the county applied fair and reasonable market value instead of current use value. So as to conform with the legislative intent behind Act 135, the county shall base these revaluations on the specific current use formula set out in H.J.R. 153.
As we have previously stated, the legislature approved H.J.R. 153 to recommend sorely needed guidelines for the implementation of current use valuation. At that time the Department of Revenue had issued no rules or regulations concerning the formulation of current use value, nor had the Montgomery County Tax Assessor taken any steps toward arriving at a system of current use valuation.
We recognize that House Joint Resolution 153 was not an Act of the Legislature, as such. Gunter v. Beasley, 414 So.2d 41
(Ala. 1982). Nevertheless, at the time the appellants formulated their current use schedules, it was the latest expression of the Legislature on the intent behind Act No. 135 and on the method the appellants should use to implement Amendment No. 373.
We can say, therefore, that H.J.R. 153, as a valid expression of legislative opinion, gives a definite formula for current use valuation consistent with the legislative purpose behind Act No. 135. The preamble to H.J.R. 153 explicitly states that the method of appraisal set out therein "would fulfill the legislative mandate contained in Section 4 of Act No. 135 with respect to agricultural and forest property." As the trial court noted, the relatively brief period between the passage of the two measures and the fact that some of the same legislators were sponsors of each further demonstrate that H.J.R. 153 was in fact consistent with Act No. 135.
The trial court ordered the appellants to formulate a new current use schedule consistent with Act No. 135. To prevent any further confusion or delay, we hold that the tax assessor must now apply the formula set out in H.J.R. 153.
We therefore affirm the trial court's judgment ordering appellants Driver and Miller to formulate a new current use schedule based on the guidelines of H.J.R. 153. Under the trial court's order, appellants shall then use this schedule to redetermine the current use value of appellees' land for those tax years in which the previously mentioned "Current Use Schedule" and "Current Use Land Pricing Schedule" were applied in Montgomery County. Following these assessments, each class member shall be entitled to a refund equal to the difference between ad valorem taxes previously paid and the amount of taxes due as figured under the new schedule.
VI. Was the grant of attorneys' fees proper in this case?
In Alabama, attorneys' fees are recoverable only where authorized by statute, when provided in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be paid. ShelbyCounty Commission v. Smith, 372 So.2d 1092 (Ala. 1979); Stateex rel. Payne v. Empire Life Ins. Co., 351 So.2d 538 (Ala. 1977). We affirm the trial court's finding that the decree creates a common fund from which counsel fees may be paid.
An identifiable common fund, termed the "refund pool" by the trial court, will be created prior to the actual distribution of refunds to eligible landowners:
 "The Court finds that counsel for the plaintiffs have, by virtue of the tax refund ordered herein, created a pool of assets or common fund that will benefit the class immediately as well as prospectively through the reduction of future ad valorem taxes. . . . The defendants shall provide the plaintiffs with an accounting of all anticipated refunds . . . and the plaintiffs shall thereafter have reasonable access to the books and records of the defendant as are necessary, in the discretion of plaintiffs' counsel, to verify the amount of the refund ordered herein. Following the deduction of fees and costs, the balance of the refund shall be *Page 451 
distributed prorata [sic] to each eligible landowner accompanied by a clear explanation of the refund due and the deduction of attorneys' fees and costs."
Consistent with the underlying philosophy of the common fund doctrine, an award of attorneys' fees from this fund spreads the costs and expenses of litigation among all those who benefit. The attorneys herein rendered their services not only for the litigant landowners, but also for all other members of the class. As this Court stated in Kimbrough v. Dickinson,251 Ala. 677, 684, 39 So.2d 241 (1949):
 "The rule rests upon the ground that where one litigant has borne the burden and expense of the litigation that has inured to the benefit of others as well as himself, those who have shared in the benefits should contribute to the expense." (Citations omitted.)
See also, Annot., 89 A.L.R.3d 690 (1979).
For the reasons stated in this opinion, the judgment of the trial court is affirmed except as to the relief granted to landowners who did not apply for current use treatment.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
All the Justices concur.
[1] Act 135 is found at 1978 Ala. Acts 1868, and was codified at Code 1975, § 40-7-25.1, et seq. Sections 40-7-25.1, et seq., as found in the 1982 supplement to the code, set out the current use law as amended by Act 302, Acts of Alabama, Regular Session, 1982 (1982 Ala. Acts 383).
[2] See, e.g., Johnston-Clark Appraisal Co. v. State,392 So.2d 1164 (Ala. 1980).
[3] 1978 Ala. Acts 1587.
[4] Supra, n. 1.
[5] An order issued by the Commissioner of Revenue on May 28, 1979, and a regulation issued by the Commissioner on June 1, 1979, give the date of H.J.R. 153 as May 24, 1979. The discrepancy between the May 24 date and the May 31 date shown in the resolution is not at issue in this case.
[6] Act No. 302, 1982 Ala. Acts 383, mandates a more detailed income capitalization method for current use valuation for tax years beginning October 1, 1981, and thereafter. This is consistent with the intent expressed in H.J.R. 153.
[7] This aspect of Graves is distinguishable from the case at bar regarding the necessity of filing an application, because Graves clearly had a right and the question concerned his remedy. As set out in Issue II, appellees herein have no redressable right in the absence of a filing for current use treatment.