Defendants, Louise Galbreath and C G Excavating, Inc. (C 
G), appeal from a judgment of $50,000.00, entered after a jury verdict in favor of H.K. Scott.
C G was organized under the laws of Florida. Galbreath and Scott each owned twenty-five shares of stock in the corporation. By virtue of an alleged interest in the fifty-first share of stock in C G, Galbreath was able to elect herself and her son to the board of directors and make herself managing officer of the corporation. C G's only asset was a lease to coal lands in DeKalb County, Alabama (the Dixson property). Galbreath, acting on behalf of C G, entered into a contract with Brown Brothers Coal Co., Inc. (Brown Brothers) to extract and transport the coal from the Dixson property in exchange for the payment of royalties by Brown Brothers to C 
G and to Dixson. C G also paid a part of the royalties it received to Dixson. Mining operations took place between December 1979 and April 1981, during which time C G received slightly more than $300,000 from the mining operation.
Scott's complaint named both Galbreath and C G as defendants. In it he alleged that he had received nothing from the mining activities and that he was entitled to recover based on his ownership of the mineral rights to the Dixson property or his ownership of C G stock. Prior to the trial, the parties entered into a stipulation whereby the question of Scott's ownership of the mineral rights was not to be submitted to the jury, but was to be tried before the court without a jury. The theory presented to the jury was that Galbreath improperly wasted or diverted corporate funds, thereby depriving Scott of his share of the corporate profits.
Galbreath, as managing officer of C G, spent virtually all of the money received by C G from the mining operation. Galbreath testified that C G paid Dixson $118,107.42 in royalties. Dixson testified that he only received $50,909.27. Galbreath also testified that she paid herself $31,378.64 in salary, $4,681.23 in travel expenses and $12,382.89 in rent for vehicles and business equipment owned by Galbreath and used by C G. The corporation also rented an apartment where Galbreath lived and conducted C G's business, for which it paid $5,216.50; the corporation also paid $3,737.06 in utility bills for the apartment, $15,781.38 for gasoline and oil, and $3,237.76 for repairs for vehicles C G rented. C G also hired two of Galbreath's acquaintances from Florida at a cost of $23,269.71. These employees were charged with keeping up with the extracted coal and insuring *Page 456 
that it was taken to the washer and properly accounted for. C 
G also was forced to hire a guard at a cost of $5,508.00 to protect the operation from Dixson and his sons, who, according to Galbreath, perpetrated numerous acts of violence against Galbreath and Brown Brothers. C G spent $49,644.00 for legal fees to represent Galbreath and C G in other lawsuits. SeeColeman v. Galbreath, 351 So.2d 888 (Ala. 1977); Dixson v. C G Excavating, Inc., 364 So.2d 1160 (Ala. 1978). Payments were also made for interest on a loan, taxes, insurance, drilling, and miscellaneous supplies.
On appeal the defendants question (1) whether the trial court erred in exercising jurisdiction over the case because of pending litigation in Florida between the parties and (2) whether there was sufficient evidence to support the judgment.
(1) Following an unsuccessful attempt by Galbreath's original co-incorporator to divest her of her interest in C G, Colemanv. Galbreath, 351 So.2d 888 (Ala. 1977), Galbreath filed an action in Florida against C G seeking an accounting.Galbreath v. C G Excavating, Inc., et al., # 75-603, 5th Judicial Circuit of Florida. Scott filed an intervention in the Florida case after he acquired an interest in C G. Scott requested an accounting and sought to otherwise protect his interest in the corporation.
Galbreath and C G take the position that the trial court erred in assuming jurisdiction over the case due to the pending action in Florida. In support of their contention they citedHudson Thompson v. First Farmers Merchants Bank, 265 Ala. 557, 93 So.2d 415 (1957), and Fegaro v. South Central Bell,287 Ala. 407, 252 So.2d 66 (1971). Those cases stand for the proposition that a suit pending in federal court may be pleaded as a bar to a subsequent action in state court between the same parties concerning the same issues.
Here, since the action was pending in the court of a sister state, not a federal court, Hudson and Fegaro do not control.
 "The mere pendency of an action in one state has no effect upon the right to bring an action in another. Whichever suit is first carried to judgment then bars the other, but it is only the rendition of judgment which has that effect. Until judgment is rendered, successive suits may be brought, on the same cause of action in a dozen different states. While rendition of judgment on a prior judgment from another state as a cause of action does not discharge the prior judgment by merger or otherwise, the satisfaction of either judgment will discharge both."
R. LeFlar, American Conflicts Law § 75 (3d ed. 1977) (citations omitted). See also, Hall v. Milligan, 221 Ala. 233,128 So. 438, 439 (1930).
(2) The case was tried on the question of whether the expenditures made by Galbreath on behalf of C G were reasonable and necessary in the operation of the business. Scott contended that since C G did not do the mining, but simply collected royalties on its lease, the expenditures were unnecessary and wasteful. Galbreath discussed the nature of each expense and testified that all of the expenditures were necessary and reasonable in the operation of the business. The court instructed the jury that if it found that corporate assets had been wasted, Scott was entitled to a judgment based on his share of the corporation's stock. There were no exceptions to the charge.
Traditional concepts of corporation law treat the ownership and management aspects of a corporation as discrete entities. In theory, the management of the corporation is vested in a board of directors elected by a majority vote of the shareholders. Since the majority stockholders have the power to elect all, or in cases of cumulative voting, most, of the members of the board, the board is typically responsive to the wishes of the majority. See F. O'Neal, Oppression of MinorityShareholders § 1.02 (1975). Since the traditional corporate scheme did not envision any managerial function on the part of stockholders, courts *Page 457 
have been reluctant to allow minority shareholders to question the judgment of the board. This principle is referred to as the "business judgment rule." See, e.g., Donahue v. RoddElectrotype Co., 367 Mass. 578, 328 N.E.2d 505, 513-14 (Mass. 1975); Bartow Lumber Co. v. Enwright, 131 Ga. 329, 62 S.E. 233,235 (1908).
The concept of limited liability, which allows investors to insulate personal assets by limiting their risk to the amount of their investment, has encouraged the use of the corporate form by companies owned and operated by only a few individuals. Unlike the typical shareholders in a publicly held corporation, who are merely investors interested in financial gain without the concomitant responsibilities of management, the shareholders in a close corporation typically conduct the enterprise themselves. There usually is no clear division between the ownership and management aspects of the corporation. When shareholders serve on the board of directors and appoint themselves as officers, the enterprise acquires many of the attributes of a partnership or sole proprietorship and ceases to fit neatly into the classical corporate scheme. See 1 O'Neal, Close Corporations §§ 1.07, 1.10 and 1.12 (2d ed. 1971).
When majority stockholders personally assume the multiple roles of owners, board of directors, and managing officers, they can not only deprive minority shareholders of a voice in the operation of the business, but they can also siphon off corporate income and deprive minority owners of income from their interest in the business. Minority shareholders can find themselves holding stock which pays no dividends and which cannot, as a practical matter, be sold. Majority shareholders can "squeezeout" minority owners.
There is a trend among courts to adopt attitudes toward close corporations which reflect the realities of the situation and which recognize a distinction between closely and widely held corporations. In Burt v. Burt Boiler Works, Inc., 360 So.2d 327
(Ala. 1978), this court ruled that "majority stockholders owe a duty to at least act fairly to the minority interests. . . ." 360 So.2d at 331. We recognized a cause of action where majority shareholders, "acting through the board and corporate officers, which they control, deprive the minority stockholders of their just share of the corporate gains. . . ." 360 So.2d at 332.
As the sole operating officer of C G, Galbreath was responsible for making the expenditures in question. She engaged in self-dealing by leasing vehicles and office equipment to the corporation. She paid herself travel and living expenses as well as a salary. The question of whether the various expenditures were made in a good faith effort to further the legitimate interests of C G was a question of fact. Galbreath's naked assertion that the expenditures were reasonable did not remove the issue from the providence of the jury.
The verdict in favor of Scott cannot, however, be allowed to stand. The waste of corporate assets by majority stockholders is primarily an injury to the corporation itself. The injury to minority stockholders is secondary. See 13 Fletcher, CyclopediaCorporations § 5924 (1980). If the corporation refused to assert its cause of action, an action may be maintained by stockholders on behalf of the corporation. In such an action the corporation is the real party in interest and would be the one in whose favor a judgment would be rendered. See AltoonaWarehouse Co. v. Bynum, 242 Ala. 540, 7 So.2d 497, 501 (1942).
Scott could recover personally in an action based on his alleged ownership of the mineral rights to the Dixson property. Under that theory his injuries would not be derived from those of the corporation. This judgment was not, however, based on that theory, as the parties agreed not to submit that issue to the jury.
The judgment is reversed and the case remanded for further proceedings.
REVERSED AND REMANDED.
TORBERT, C.J., and ALMON, EMBRY and ADAMS, JJ., concur. *Page 458