562 So.2d 485 (1990)
Ex parte Bradley BROWN, Jr., et al.
(In re J.O. BANKS, et al. v. Paul W. BRYANT, Jr., et al.)
Ex parte Bradley BROWN, Jr., et al.
(In re Bradley BROWN, Jr., et al. v. Paul W. BRYANT, Jr., et al.)
Bradley BROWN, Jr., et al.
v.
Paul W. BRYANT, Jr., et al.
J.O. BANKS, et al.
v.
Paul W. BRYANT, Jr., et al.
88-98, 88-99, 88-120 and 88-121.
Supreme Court of Alabama.
March 2, 1990.
As Modified on Denial of Rehearing May 4, 1990.
*486 Frank M. Bainbridge and Bruce F. Rogers of Porterfield, Schall, Bainbridge, Mims & Harper, Birmingham, for appellants-petitioners.
James J. Jenkins and Sam M. Phelps, of Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, for respondents.
PER CURIAM.
These cases involve a dispute between the minority and majority stockholders of Greene Group, Inc., a corporate holding company that controls the Greene County greyhound racing track known as "Greenetrack." This Court first heard the dispute over the manner in which the majority stockholders, who are also corporate officers-directors, obtained a contract to manage a newly formed greyhound racing track in Macon County for their wholly-owned entity Pari-Mutuel Management ("PMM"), in Banks v. Bryant, 497 So.2d 460 (Ala.1986). We held in Banks v. Bryant that the majority stockholders had impermissibly acted in their individual capacities in contracting for the Macon County greyhound track. We ordered an accounting and directed the circuit court to impress a constructive trust in favor of Greene Group, Inc., consistent with the results of the accounting.
The named plaintiffs are minority stockholders and they collectively own 19% of the stock of Greene Group, Inc., a holding company owning all of the stock of its subsidiary, Greene County Greyhound Park, Inc.[1] The defendants, Paul W. Bryant, Jr., Sam M. Phelps, and Dr. A. Wayne May, are the majority stockholders and they collectively own 81% of the outstanding stock. In addition, Bryant is president and chief executive officer of both corporations, Phelps is secretary and general counsel of both corporations, and May is a director and an officer and veterinarian for Greenetrack.
On December 12, 1985, while Banks v. Bryant was on appeal, the minority stockholders filed a second stockholders' derivative action in Greene County, Alabama, styled Brown v. Bryant, against Bryant, Phelps, and May and their newly formed Iowa corporation, Alabama Iowa Management, Inc. ("AIM, Inc."). The minority asserted in this suit that the defendants had obtained for themselves another contract to manage a newly formed dog track in Council Bluffs, Iowa, and that they had again utilized for their own advantage the corporate facilities, expertise, assets, and resources of Greene Group, Inc.
The minority stockholders also sued the law firm of Phelps, Owens, Jenkins, Gibson & Fowler ("the Phelps firm"), alleging a conflict of interest in that the firm had represented both Greene Group, Inc., and Bryant, Phelps, and May individually, in Banks v. Bryant, and that there was a direct conflict of interests between Greene Group, Inc., and the individual defendants. The minority shareholders sought a recovery *487 of $279,362.64 in fees and expenses charged to and paid by Greene Group, Inc., for representing the corporation through trial. The minority alleged that, because of the conflict of interests, the Phelps firm had forfeited its right to compensation from Greene Group, Inc.
An amended complaint was subsequently filed in Brown v. Bryant alleging that the majority stockholders were attempting to "squeeze out" the minority stockholders. As an alternative to direct relief for the minority stockholders claimed from the "squeeze out," the amended complaint sought the appointment of a custodian-special master-conservator to prevent stockholder abuse and for the purpose of fixing fair and reasonable salaries and fair and reasonable dividends for the stockholders. The majority stockholders filed an answer denying that the plaintiffs are entitled to relief. However, the defendants conceded the Iowa opportunity and repaid some of the AIM, Inc., fees to Greene Group, Inc., in connection with the repayment of the Macon venture.[2] The loan fees paid to Bryant, Phelps, and May are a subject of dispute.
The trial judge in Banks v. Bryant consolidated Banks v. Bryant and Brown v. Bryant over the objection of the minority stockholders. The issues in dispute in these consolidated cases were tried in the fall and winter of 1987, concluding on December 16, 1987. The trial judge entered a final judgment on May 25, 1988, which was subsequently withdrawn and replaced by a final judgment dated September 21, 1988, from which the minority stockholders appeal.
The minority stockholders also have filed a petition for a writ of mandamus to compel the trial judge to enter an order consistent with this Court's holding in Banks v. Bryant. This Court authorized the parties to address the petitions for writ of mandamus and the appeals in one set of briefs.

I.
We first address the petitions for writ of mandamus. We have previously held that a petition to this Court for a writ of mandamus is the proper method for bringing before us the question of whether a trial judge, after remand, has complied with our mandate:
"We have also held, however, that a petition to this Court for a writ of mandamus constitutes a proper method for reviewing the question of whether a trial judge, after remand, has complied with our mandate. Town of Daphne v. City of Fairhope, 284 Ala. 556, 226 So.2d 383 (1969); Ex parte Utility Service Corp. of Huntsville, 435 So.2d 1259 (Ala.1983). In fact, this Court, on at least two occasions, has granted writs of mandamus to compel a trial judge to enter an order in conformity with a prior decision of this Court. Ex parte Utility Service Corp. of Huntsville; Ex parte Jim Walter Corp., 283 Ala. 295, 216 So.2d 183 (1968)."
Ex parte Ins. Co. of North America, 523 So.2d 1064, 1068-69 (Ala.1988).
The minority stockholders contend that the trial court did not follow the mandates of this court in Banks v. Bryant and that a writ of mandamus should issue. They state that they seek to compel the trial court's compliance with Banks v. Bryant as follows:
"(i) Impose the constructive trust in favor of Greene Group, Inc. (and not a company known as Greene Resources, Inc.).

*488 "(ii) Impose a constructive trust over the defendants Bryant's, Phelps' and May's shares of stock in Pari-Mutuel Management, Inc. (and AIM, Inc., as controlled by the opinion of this Court in Banks v. Bryant).
"(iii) Strike that portion of the trial court's Order that rewards and profits the defendants Bryant, Phelps and May for their wrongdoing, and direct the trial court to restore to Greene Group, Inc., the full `net value of the proceeds earned by ...' Bryant, Phelps and May from the Macon venture and the Iowa venture."
(Minority shareholders' petition, page 6.)
This Court held in Banks v. Bryant as follows:
"We hold, therefore, under the undisputed facts of this case, that the majority stockholders impermissibly acted in their individual capacities in contracting with the Macon County group for the construction and operation of the Macon County track. Consequently, the judgment is reversed and this cause is remanded for further proceedings to include an accounting with respect to Defendants Bryant's Phelp's and May's shares of stock in Pari-Mutuel Management, Inc. and the net value of the proceeds earned by these Defendants from the Macon County venture, including salaries, dividends, or other distribution of profits earned as officers of the operating corporation. The court is further directed to impress a constructive trust in favor of Greene Group, Inc. consistent with the results of the accounting. As a condition for the imposition of a constructive trust, as herein ordered, the trial court in its discretion may direct these Plaintiffs, or the corporation for whose benefit they seek relief, to assume certain obligations commensurate with the relief granted, as equitable principles and good conscience may require."
497 So.2d 460 at 465. Accordingly, the judgment was reversed and the case was remanded to the trial court with instructions.
We must determine, from the evidence presented, whether the trial court has followed the mandates of this Court on remand. To do so, we must consider our holding stated above against the trial judge's order of September 21, 1988, which reads in pertinent part:
"1. ISSUE OF CONSTRUCTIVE TRUST:
"The Supreme Court ordered imposition of a constructive trust consistent with the results of the accounting made to the trial court. The Court finds that Greene Resources, Inc. is a wholly-owned subsidiary of Greene Group, Inc. For business and corporate planning reasons, defendants have requested that the constructive trust be imposed so that funds flow to Greene Resources, Inc. This Court is of the opinion that imposition of a constructive trust in favor of Greene Resources, Inc. will enable plaintiffs to receive the same benefits of the constructive trust which the plaintiffs would receive if the trust were imposed in favor of Greene Group, Inc., and the defendants' request that the trust be imposed for the benefit of Greene Resources, Inc. is a reasonable request. Therefore, a constructive trust is hereby imposed in favor of and for the benefit of Greene Resources, Inc. upon the following:
"(1) The management agreement dated the 28th day of September 1983 by and between Pari-Mutuel Management, Inc. (hereinafter PMM, Inc.) and Macon County Greyhound Park, Inc. and any renewal or renegotiated contract between these parties, which said management agreement shall inure in favor of and to the benefit of Greene Resources, Inc.
"(2) The management agreement dated the 11th day of December, 1984 and the amendment thereto dated November 15, 1986 by and between AIM, Inc., and Iowa West Racing Association, a non-profit corporation, and any renewal or renegotiated contract between these parties, which said management agreement shall inure in favor of and to the benefit of Greene Resources, Inc.
"(3) All of the profits of PMM, Inc. and any assets acquired with such profits *489 of AIM, Inc., less and except loan closing and loan enhancement fees."
While we acknowledge that our mandate was not as specific as it might have been, the trial court's order on its face shows that the trial judge did not follow the mandate of this Court. We directed that a constructive trust be impressed in favor of Greene Group, Inc. The trial judge, at the request of the defendants, imposed a constructive trust so that funds flowed to Greene Resources, Inc., not Greene Group, Inc., and did this over the objection of the minority shareholders and without hearing any evidence. There is no evidence in the record to sustain the trial judge's actions as being "for business and corporate planning reasons." Greene Resources, Inc., is not a party to these proceedings; Greene Group, Inc., is the corporation in which the minority owns stock and for whose benefit the suit was brought.
We therefore reverse the judgment of the trial court and remand the case for a constructive trust to be imposed in favor of Greene Group, Inc., unless the majority shareholders can demonstrate that the imposition of the trust in favor of Greene Resources, Inc., is identical to what we ordered.

II.
There is also the question of the salaries, dividends, or other distribution of profit over which this Court required an accounting in Banks v. Bryant. The directive to the trial court was "to impress a constructive trust in favor of Greene Group, Inc., consistent with the results of the accounting." Bryant, Phelps, and May repaid the PMM loan fees and portions of the AIM, Inc., fees as required by this Court, representing that the PMM and AIM, Inc., management fees were $13,398,000. However, the trial court did not require that they pay the loan fees.
On December 21, 1984, Bryant, Phelps, and May (sole directors of AIM, Inc.) voted unanimously to pay the loan fees directly to themselves. The fees were paid to them on January 2, 1985, in direct proportion to their stock ownership in AIM, Inc.[3] In addition, Bryant, Phelps, and May collectively received $200,000 as a 5% loan fee in connection with $4 million in additional financing. Again, this amount was divided in direct proportion to their stock ownership in AIM, Inc.[4] The minority claims that the loan fees are disguised dividends to Bryant, Phelps, and May. They argue that it is not just happenstance that the loan fees were paid to them in direct proportion to their stock ownership.
The trial judge refused to impose a constructive trust over the AIM, Inc., loan fees, because Bryant, Phelps, and May gave their personal guaranties in connection with the financing of the Iowa venture. He held as follows:
"Under the accounting as held by the Court, it is determined by the Court that the loan closing fees, loan enhancement fees, and fees for other personal guarantees of Greene Group, Inc. obligations paid or to be paid to the defendants, Bryant, Phelps and May or the entities upon which a constructive trust has been imposed are the property of Bryant, Phelps and May and are not due to be paid to Greene Group, Inc. The court finds that the guarantees of the three (3) individual defendants, Bryant, Phelps and May were required of them individually, and not in their capacity as officers or directors of Greene Group, Inc., and that such fees are not income from a corporate opportunity." *490 Order of September 21, 1988, at page 9 (C.R. 562).
Bryant, Phelps, and May contend that their personal guaranties were required to secure the loans. They presented the testimony of two bankers involved in processing these loans. Carl Albright of the First National Bank of Tuscaloosa testified as follows:
"A. My understanding of your question is why we required Mr. Bryant and Mr. Phelps and Mr. May to endorse this note or guarantee this debt.
"Q. And that is what I am asking from the bank's standpoint.
"A. The bank goes into the loan transaction with the primary objective of not losing any money and it hopes to make a little profit for its shareholders in transactions of this type. The nature of this business is so volatile, the political environment is so intense, the economics of it are so massive, that it is essential that the persons who direct the day-to-day management of this corporation pledge their personal assets and their personal credit to it, and that's why we required it." (R. 1478-1479.)
Because these loans were tied to the individual effort of Bryant, Phelps, and May and would not have been secured without their personal endorsement, we affirm the trial court's judgment as to the AIM, Inc., loan fees.
The trial judge ordered retroactive salaries for Bryant, Phelps, and May in the amount of $1,990,000. The claim for the retroactive salaries was made within a matter of days of their repayment of the constructive trust funds. The additional retroactive salaries claimed for the years 1984 through 1986 equaled $3,382,500, which is $2,782,500 in excess of the amounts actually paid to them.[5] This is despite the fact that Phelps is an attorney in private practice who represents Greene Group, Inc., for a fee, and Dr. May is a full-time veterinarian who, for a fee, performs services for the various tracks.
In his testimony in Brown v. Bryant, Bryant stated:
"The basis for the claim [retroactive salaries] is that I was doing very substantial services and worked for Pari-Mutuel and AIM during '84 and '85 and '86. I thought I was receiving compensation for them because I thought I owned them. We had done the accounting the end of December of '86 and paid all of the revenue from those efforts into Greene Group and I think I should be compensated." (R. 1254.)
The trial judge awarded Bryant, Phelps, and May retroactive salaries in his final order of September 21, 1988, and set the 1987 salaries.[6]
*491 We remand the question of retroactive salaries to the trial court. Retroactive salaries should not be awarded unless there is an affirmative showing of actual services rendered to the corporation that would justify the award of such salaries.

III.
A further issue arises as to the amount of interest due to Greene Group, Inc., on the $13,398,000 principal constructive trust funds repaid to Greene Group by Bryant, Phelps, and May on December 30, 1986, pursuant to our order in Banks v. Bryant. It is undisputed that only principal has been paid.
The majority stockholders contend that interest should be computed at 6% simple interest and that no interest is due except from the date the funds were received by them personally as opposed to the date that the management fees were actually received by PMM and AIM, Inc. They calculate the interest due and owing as $422,328.57.
The minority stockholders contend that the appropriate rate is that actually earned by the investment of the funds by Bryant, Phelps, and May while the trust funds were in their control. They present four possible methods for calculating the interest, one of which uses a straight 6% interest calculation. Using three of the methods, which are based on return on the investments, they calculate the interest due and owing as $1,489,944; $1,417,511; or $1,318,428. Using the 6% interest method, compounding interest annually, and adding excess profits, they calculate the interest as $1,248,176.
The majority stockholders presented the testimony of Steve Roy, a certified public accountant. Roy testified that he calculated the interest due at 6%. He admitted that he charged interest only from the date that Bryant, Phelps, and May individually received the funds, as distinguished from the date the funds were actually paid. Roy also testified that he did not calculate any interest on those amounts that Bryant, Phelps, and May allegedly paid as income tax owed as a result of their receipt of trust funds. Although the amounts allegedly paid as income tax total $2,254,240 allegedly paid by Bryant, $814,123 allegedly paid by Phelps, and $452,416 allegedly paid by May, Roy could not testify that these amounts were actually paid. (R. 1032-1033.)
The minority shareholders presented their expert, James L. Hart, also a certified public accountant. He presented his own study of interest computed at the rate of 6%, which, when compounded, totalled $731,276. With adjustments for the excess profits of the defendants, Hart reached a total interest due of $1,248,176. (C.R. 442.)
We hold that the interest due and owing should be calculated using a 6% rate of interest, compounded annually from the date Bryant, Phelps, and May received the funds. Ala.Code 1975, § 8-8-1.

IV.
We next address the question of whether the majority stockholders have, by their actions, impermissibly squeezed out the minority stockholders.
In Burt v. Burt Boiler Works, Inc., 360 So.2d 327 (Ala.1978), this Court stated as follows:
"It is no longer seriously debated that majority stockholders owe a duty to at least act fairly to the minority interests, and the majority cannot avoid that duty merely because the action taken is legally authorized. O'Neal, Close Corporations, § 8.07 says:
"`In the past, some courts have permitted majority shareholders to exercise, without any restriction other than good faith, whatever powers they had as controlling shareholders under the statutes and the corporation's charter and bylaws; and further, they have treated the fiduciary duties of the directors *492 as running only in favor of the corporation, not to the minority shareholders. This view that the controlling shareholders and the directors do not owe fiduciary duties to minority shareholders appears outmoded, at least as applied to ... attempts to eliminate minority shareholders or to deprive them of their proportionate rights and powers without a just equivalent.... But this does not mean that the directors or the majority shareholders should be permitted to exercise their powers arbitrarily or without regard to the legitimate expectations of the minority shareholders; and many of the older decisions and practically all of the recent ones indicate that controlling shareholders, in some circumstances at least, owe fiduciary duties to minority shareholders, and that the courts will require them (whether they act in their capacity as shareholders or through directors or officers whom they control) to observe accepted standards of business ethics in transactions affecting rights of minority shareholders ...'"
360 So.2d 327, 331-32.
In Galbreath v. Scott, 433 So.2d 454 (Ala.1983), this Court discussed the opportunities that majority shareholders in a closely held corporation have to "squeeze out" the minority's voice in the operation of the business:
"When majority stockholders personally assume the multiple roles of owners, board of directors, and managing officers, they can not only deprive minority shareholders of a voice in the operation of the business, but they can also siphon off corporate income and deprive minority owners of income from their interest in the business. Minority shareholders can find themselves holding stock which pays no dividends and which cannot, as a practical matter, be sold. Majority shareholders can `squeezeout' minority shareholders.
"There is a trend among courts to adopt attitudes toward close corporations which reflect the realities of the situation and which recognize a distinction between closely and widely held corporations. In Burt v. Burt Boiler Works, Inc., 360 So.2d 327 (Ala.1978), this court ruled that `majority stockholders owe a duty to at least act fairly to minority interests....' 360 So.2d at 331. We recognized a cause of action where majority shareholders, `acting through the board and corporate officers, which they control, deprive the minority stockholders of their just share of the corporate gains....' 360 So.2d [at] 332."
433 So.2d at 457.
O'Neal's Oppression of Minority Shareholders, § 3.02, describes squeeze out techniques as follows:
"§ 3.02. Squeeze techniques in general... [H]olders of a majority of the voting shares in a corporation, through their ability to elect and control a majority of the directors and to determine the outcome of shareholders' votes on other matters, have tremendous power to use a great variety of devices or modes of operation to benefit themselves at the expense of minority shareholders.
"Here are a few illustrations. The squeezers may refuse to declare dividends; they may drain off the corporation's earnings by exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, by high rental agreements for property the corporation leases from majority shareholders, or by unreasonable payments under contracts between the corporation and majority shareholders; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders or to companies in which the majority are interested; they may organize a new company in which the minority will have no interest, transfer the corporation's assets or business to it, and perhaps then dissolve the old corporation; or they may bring about the merger or consolidation of the corporation under a plan unfair to the minority. As indicated, the techniques listed here merely illustrate the techniques *493 which resourceful squeezers may utilize."
F.H. O'Neal and R. Thompson, O'Neal's Oppression of Minority Shareholders § 3:02 (2d ed.1985).
The minority stockholders make a number of factual claims that they assert show the majority's attempt to squeeze out the minority. The majority stockholders contend there has been no "squeeze out" and that the minority wants to substitute its business judgment for that of the majority. They argue that they have met the "reasonable expectations" for the minority stockholders by the increase in the value of the stock. Each minority shareholder paid $25.00 per share of stock in Greene Group, Inc., when it was formed in 1977. The corporation purchased stock from some of the minority shareholders in December 1986, for an average price of $4,583 per share. Using this price,[7] the majority calculates the original $5,000 investment of plaintiff Bradley Brown as being worth $916,600 on December 31, 1986, and far more now.[8] The majority's contention seems to be that the minority has no cause to complain of a "squeeze out," and should not care whether there are dividends, since the stock has increased so greatly in value. The fact, however, that the stock has increased in value is no answer to the charge of systematic squeeze out of the minority.
An examination of the record shows that the majority stockholders have systematically moved to squeeze out the minority stockholders, in that the majority stockholders have removed all minority stockholders from all positions as officers and directors;[9] have eliminated cumulative voting; voted a raise for Bryant, Phelps, and May in 1987 which was a marked increase from previous years;[10] have sought for themselves individually corporate opportunities in Macon County, Alabama, and in Iowa; have paid inadequate dividends or failed to pay dividends; have cancelled the *494 minority stockholders' right to use the recreational farm, Thisildu, in Greene County; and have cancelled the preemptive rights of shareholders.[11]
The minority has made an affirmative showing that the majority has systematically sought to squeeze out the minority. The failure to pay adequate dividends when so much income is being made by the corporation and the salaries for Bryant, Phelps, and May are being raised is prima facie evidence of a squeeze out. The board of directors of a corporation, acting through the officers, is entitled to conduct the business of the corporation for the mutual profit of all of the stockholders. The minority is not entitled to any special privilege, but it is entitled to fair treatment in the corporate decision-making process. We direct the trial court on remand to determine whether the majority has acted in the best interest of all the stockholders or whether its decisions were made for the purpose of squeezing out the minority, as the bare facts seem to suggest. If the trial judge determines that the rights and interests of the minority stockholders have been prejudiced by the actions of the majority stockholders, he shall determine and fix an amount necessary to compensate the minority for this breach of duty owed them by the majority. F.H. O'Neal and R. Thompson, Close Corporations § 9:30 (3rd ed.).

V.
We now consider the question of attorney fees for both majority and minority counsel.
The record reflects that the Phelps firm was paid $279,362.64 as attorney fees and expenses by Greene Group, Inc. This payment was authorized by the majority stockholders of Greene Group, Inc. We first look at the question of the attorney fees paid to the Phelps firm. The minority stockholders contend that the dual representation of both Greene Group, Inc., and the named defendants by the Phelps firm was a glaring conflict of interests and that the firm has therefore forfeited any right to attorney fees. The minority argues that this law firm's efforts have always been and continue to be directed toward the best interests of Bryant, Phelps, and May and adverse to the best interests of Greene Group, Inc., and that the majority shareholders should pay the fees. Therefore, they contest the trial judge's order allowing payment of one-half of the attorney fees as being inequitable as well.
The Phelps firm argues that "[t]o the extent that claims against Greene Group, Inc. were asserted in either Banks v. Bryant or Brown v. Bryant, the corporation was and is entitled to defend itself." The majority stockholders argue that they are entitled to make reasonable business judgments and to have the corporation defend the judgments they make. They cite us to Code 1975, § 10-2A-21, and contend that this Code section provides that an award of attorney fees may be made in cases exactly like this.
Section 10-2A-21, Code 1975, reads as follows:
"(a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the corporation), by reason of the fact that he is or was a director, officer, employee or agent of the corporation, ... against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such claim, action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best *495 interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his conduct was unlawful...."
The trial court on the re-trial of the case provided that the fees be split equally between Greene Group, Inc., and Bryant, Phelps, and May. In light of Alabama statutes under which a corporation may indemnify its officers, we affirm the judgment of the trial court as to the attorney fees for counsel for the majority.
The second question before us is the question of reasonable attorney fees for counsel for the minority stockholders. The trial judge's order of September 21, 1988, set attorney fees for minority counsel and stated in pertinent part:

"3. ISSUE OF ATTORNEY'S FEES:
"Attorney's fees paid to defendants' counsel for the first trial of this case and the appeal of same until such time as the Supreme Court issued its opinion, if not paid, shall be paid by Greene Group, Inc.
"Attorney's fees paid to counsel for the defendants on the retrial of issues in this Court, as required by the Supreme Court, shall be allowed as paid or claimed, with one-half of the fee to be paid by Greene Group, Inc. and one-half to be paid by the individual defendants, Bryant, Phelps, and May, in proportion to the respective ownership of such individuals in Greene Group, Inc.
"Counsel for plaintiff is awarded an attorney's fee of Nine Hundred Five Thousand, Six Hundred Three ($905,603.00) Dollars. This sum is comprised of the Fifty-Five Thousand, Six Hundred Three ($55,603.00) Dollars previously paid to plaintiffs' counsel by past or present plaintiffs and an award of Eight Hundred Fifty Thousand ($850,000.00) Dollars. Additionally, plaintiffs' counsel is awarded actual expenses incurred by his firm through the date of this decree in the amount of Sixty-One Thousand, Seven Hundred Nineteen and 31/100 ($61,719.31) Dollars. This fee and the expenses are to be paid by Greene Group, Inc."
In Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala. 1985), this court spoke to the issue of attorney fees. We noted that Alabama follows the "American rule":
"`In Alabama, attorney's fees are recoverable only where authorized by statute, when provided in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be made. Shelby County Commission v. Smith, 372 So.2d 1092 (Ala.1979); State ex rel. Payne v. Empire Life Ins. Co., 351 So.2d 538 (Ala.1977).'"
471 So.2d at 1241, quoting Eagerton v. Williams, 433 So.2d 436, 450 (Ala.1983). We said further that Alabama recognizes exceptions to the American rule where fraud, willful negligence, or malice has been practiced. Reynolds, at 1243. There is also a well-recognized exception to the American rule in stockholder's derivative actions. See Mills v. Electric Auto-Lite Co., 396 U.S. 375 at 394, 90 S.Ct. 616 at 626, 24 L.Ed.2d 593 (1970). The United States Supreme Court has recognized that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable fee from the fund as a whole. Boeing Co. v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). See also Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).
The case of Peebles v. Miley, 439 So.2d 137 (Ala.1983), involved "the sensitive issue of how reasonable attorney's fees are determined." Id. at 138. In Peebles we set forth the yardsticks to be used by our courts in determining reasonable attorney fees. The first six factors cited were set forth by Justice Somerville over 77 years ago:
"`The general principle is everywhere established that an attorney is in such a case entitled to reasonable compensation for his services, appropriate to his employment, rendered by him to his client. Humes v. Decatur, etc., Co., 98 Ala. 461, 470, 13 South. 368 [1893]. In the estimation of their value many elements *496 may be material for consideration, among which are the nature and value of the subject-matter of the employment; the learning, skill and labor requisite to its proper discharge; the time consumed; the professional experience and reputation of the attorney; the weight of his responsibility; and the measure of success achieved.'"
Peebles, 439 So.2d at 140, quoting Faulk & Co. v. Hobbie Grocery Co., 178 Ala. 254, 59 So. 450 (1912). Forty years later, Justice Simpson added as an additional factor "that in determining a reasonable attorney's fee, the trial judge should take into consideration the reasonable expenses incurred by the attorney." Id. See King v. Keith, 257 Ala. 463, 60 So.2d 47 (1952).
Peebles adopted an additional five factors from the American Bar Association's Model Code of Professional Responsibility, DR 2-106(B) (1982):
"1. Whether a fee is fixed or contingent.
"2. The nature and length of a professional relationship.
"3. The fee customarily charged in the locality for similar legal services....
"4. The likelihood that a particular employment may preclude other employment.
"5. The time limitations imposed by the client or by the circumstances."
439 So.2d at 141. The 11 factors set out in Peebles are the factors to consider in determining a reasonable attorney fee.
Reynolds involved a 7-figure fee, and this Court studied 21 cases, which were included in an appendix to the opinion in that case, as a means to determine a reasonable attorney fee by comparison with fees customarily charged in various jurisdictions for similar legal services. We said as follows:
"The cases that we have considered have taught us that generally, even with the fine tuning of assessing the factors in Peebles, courts in complex six-figure and seven-figure judgments have assessed fees from 20% to 25% of the recovery. This has generally worked out to be the rule in our own State, as evidenced by the Appendix, but this is not to say that there have not been courts that have assessed one-third, or even higher fees which we, after reading the decisions, also conclude were reasonable."
471 So.2d 1238, 1245.
Counsel for the minority stockholders contend that their attorney fees should be based upon a percentage (20%) of the successful "common fund" recovery achieved for Greene Group, Inc., as a result of this shareholders' derivative litigation. The majority argues that the trial court's total award of $967,322.31 in attorney fees and expenses is not unreasonable and inadequate as a matter of law and should be affirmed.
In support of their position, counsel for the minority offered the testimony of Frank M. Bainbridge, lead attorney for the minority, and four other attorneys. Each of these witnesses testified that a reasonable fee for the minority's counsel would be 20% of the common fund recovery to date and 20% of any future common fund recovery, as and when paid.
In support of their position, counsel for the majority presented five attorneys. All testified that the fee award should be based upon the time expended and some multiplier of hourly rate, which is known as the "lodestar" approach.
We have reviewed the evidence carefully and find that this stockholders' derivative action is a "common fund" case. Therefore, counsel for the minority is due to recover 20% of the common fund presently due to be paid over to Greene Group, Inc., through December 1989. We remand the case to the trial judge to determine a fair and appropriate percentage amount, if any, to be awarded to minority counsel based on the future sums due to Greene Group, Inc., as a result of the minority counsel's representation of minority stockholders. We have weighed the evidence presented to the trial court against the factors enunciated in Peebles and Reynolds, as well as Mashburn v. National Healthcare, Inc., 684 F.Supp. 679 (M.D.Ala.1988); and Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974). The testimony, *497 examined in light of these factors, supports the award of 20% of the common fund due through December 1989, and an award of future sums if any, as determined by the trial judge. We therefore reverse and remand as to the attorney fees for minority counsel.
88-98 WRIT GRANTED.
88-99 WRIT GRANTED.
88-120 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
88-121 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
MADDOX, JONES, SHORES, ADAMS and KENNEDY, JJ., concur.
ALMON, HOUSTON and STEAGALL, JJ., concur in part and dissent in part.
HOUSTON, Justice (concurring in part and dissenting in part).
I concur with the majority on part I; that portion of part II that affirms the trial court's judgment as to loan fees; part III; and that portion of part V that affirms the decision of the trial court as to the award of attorney fees to counsel for the majority stockholder defendants.
I dissent as to part IV ("squeeze out"), and I dissent from the reversal as to the award of attorney fees to counsel for the minority stockholder plaintiffs. I believe that the record contains sufficient evidence to justify the trial court's award of retroactive salaries, and I would not remand for additional evidence on this issue.
I dissented in part in Banks v. Bryant, 497 So.2d 460 (Ala.1986). The basis for my dissent on these issues in the present case is substantially the same as it was in the earlier case:
"This case was presented to the trial court ore tenus, and on that fact hangs some of my disagreement with the majority.
"When evidence is presented ore tenus without a jury, factual findings are presumed correct and judgment based thereon will not be disturbed on appeal unless it is plainly and palpably erroneous. Wadsworth House Movers, Inc. v. Salvage One Demolition, Inc., 474 So.2d 686 (Ala.1985); Etheridge v. Yeager, 465 So.2d 378 (Ala.1985); 2B Alabama Digest § 1008.1(5). This Court must affirm the trial judge's decision if, under any reasonable aspect, it is supported by any credible evidence. Chism v. Hicks, 423 So.2d 143 (Ala.1982). Furthermore, where a trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Thomas v. Davis, 410 So.2d 889 (Ala.1982).
"As an appellate court, we have neither the luxury nor the burden that the trial court has as trier of fact. The trial court found that there was no [squeeze out]. Is there credible evidence to support this finding? Yes."
497 So.2d at 465-66.

Issue IV (squeeze out) "All this and heaven too."[12]
As I understand the majority's concept of the squeeze out principle, it is that "controlling shareholders and directors" must not attempt to "eliminate minority shareholders or to deprive them of their proportionate rights and powers without a just equivalent," and that the controlling stockholders must not exercise their powers arbitrarily or without regard to the "legitimate expectations of the minority shareholders." Burt v. Burt Boiler Works, Inc., 360 So.2d 327, 331-32 (Ala.1978). Controlling stockholders must not force the minority stockholders into a position of "holding stock that pays no dividends and which cannot, as a practical matter, be sold" and must not deprive minority stockholders of their just share of the corporate gains. Galbreath v. Scott, 433 So.2d 454, 457 (Ala.1983). I have no disagreement with this as a legal concept of "squeeze out." The facts must then be sifted and weighed by the trier of fact, whose decision we must affirm if "under any reasonable *498 aspect, it is supported by any credible evidence." Banks v. Bryant, supra.
These facts were before the trial court:

 Purchase
 Price of
 Original Value of same
 Shares on stock on
Plaintiffs 3/3/77 12/31/86
Phillip B.M. Banks $5,000.00 $916,600.00
William W. Humphries $2,500.00 $458,300.00
Bradley Brown, Jr. $5,000.00 $916,600.00
Arthur Taylor, Jr. $8,750.00 $1,604,050.00
Estelle Taylor $8,750.00 $1,604,050.00
Vesta L. Smith $5,000.00 $916,600.00
J.E. McCampbell $2,000.00 $366,640.00

Greene Group, Inc., showed an annual percentage increase in stock value of 1,870%; a percentage increase in stock value for the period of comparison (March 3, 1977, to December 31, 1986) of 18,232%; and in terms of dollars per share, an increase in stock value from $25.00 per share to $4,583.00 per share. Jim Hart, the accounting expert for the minority stockholder plaintiffs, testified that he knew of no other company that had as great a growth rate in stock value as Greene Group, Inc., did during this period.
There was evidence that retention of corporate earnings and reinvestment of these earnings in Greene Group, Inc., produced this growth in stock value, and that publicly traded companies that had significant increases in stock value during this period followed this business practice. Numerous examples of publicly traded growth companies were shown to the trial court. The Alabama based companies of Kinder-Care, Inc., Bruno's, and Russell Corporation had the largest increases in stock values of all companies compared, with the exception of Greene Group, Inc. For the comparison period (March 3, 1977, to December 31, 1986), Kinder-Care, Inc., had an annual growth rate or increase in stock value of 259% each year (1,611% less than Greene Group, Inc.); Russell Corporation had an annual growth rate or increase in stock value of 200% (1,670% less than Greene Group, Inc.); and Bruno's had a 177% increase (1,693% less than Greene Group, Inc.). Over the same period, the total percentage increase in stock value for Kinder-Care, Inc., was 2,400% (15,832% less than Greene Group, Inc.); for Russell Corporation was 1,995% (16,237% less than Greene Group, Inc.); and for Bruno's was 1,461% (16,771% less than Greene Group, Inc.). In terms of dollar value increase, after adjustment for stock splits, Kinder-Care, Inc., went from a value of $9.75 per share to $231.15 per share; Russell Corporation moved from $8.00 per share to $164.00 per share; and Bruno's increased from $15.50 per share to $242.00 per share; and Greene Group, Inc., increased from $25.00 per share to $4,583.00 per share.
The minority stockholders have received dividends. The undisputed evidence is that for each $1,000.00 invested by the minority stockholders, they were paid $2,700.00 in dividends from March 3, 1977, through 1987. Dividends will be discussed in more detail later in this opinion, but the minority stockholders have been paid substantial dividends.
What other expectations could minority stockholders have had when they purchased their stock? Employment by the corporation? The evidence showed that at the time the corporation was formed, plaintiff Bradley Brown, Jr., was the owner and operator of the famous "Cotton Patch" restaurant; Phillip B.M. Banks operated Banks and Company, a building supply business; William W. Humphries was president *499 of Merchant's Bank in Eutaw, Alabama; A.R. and Estelle Taylor were in a business that manufactured hardwood plywood for the cabinet industry; Vesta L. Smith was not an original stockholder but holds the stock purchased by her deceased husband; and J.E. McCampbell was an employee of Greene County Greyhound Park, Inc., at the time of trial and had been since Greenetrack opened. There is no evidence that any of the minority stockholder plaintiffs, who are not employed by the corporation, had, at the time they entered into this most profitable venture, any reasonable expectation of employment by the corporation that was thwarted by the majority stockholder defendants.
So what does the majority find as evidence of squeeze out that is so compelling that it concludes that the trial court's finding was plainly and palpably wrong?
The majority finds that the majority stockholder defendants have "paid inadequate dividends or failed to pay dividends." The facts before the trial court showed that the following dividends were paid:

 Purchase Total
 Price of Dividends
 Original Received
 Shares in Through
Plaintiffs 1977 1987
Phillip B.M. Banks $5,000.00 $13,500.00
William W. Humphries $2,500.00 $ 6,750.00
Bradley Brown, Jr. $5,000.00 $13,500.00
Arthur Taylor, Jr. $8,750.00 $23,625.00
Estelle Taylor $8,750.00 $23,625.00
Vesta L. Smith $5,000.00 $13,500.00
J.E. McCampbell $2,000.00 $ 5,400.00

There was evidence that the dividend had historically increased at the rate of approximately $2.50 per share, per year, and that the dividend in 1987 was $17.50 per share, which represented a 70% return on the original investment for that year. The trial court could have found that the dividends were not inadequate or abusive, particularly with management following a business philosophy of retention and reinvestment of earnings that has produced extraordinary growth in the value of the stock. I cannot hold that the trial court plainly and palpably erred in not finding that this was evidence of a "squeeze out."
The majority finds that the majority stockholder defendants "have removed all minority stockholders from all positions as officers and directors."
The trial court could have found from the evidence that J.C. Poole, Jr., and J.O. Banks were directors of Greene Group, Inc., or its predecessor at one time. Poole voluntarily resigned for a personal business reason, and Banks was not reelected because he had serious health problems that affected his ability to function as a director. No plaintiff was ever an officer or director of Greene Group, Inc. I am not persuaded by the majority's assertion that this made the trial court's factual finding of no squeeze out plainly and palpably wrong.
The majority stockholder defendants "have removed cumulative voting." I am not sure that this in and of itself is evidence of a squeeze out; however, I do not believe that cumulative voting was ever authorized. Ala.Code 1975, § 10-2A-53(d), provides that "if cumulative voting is authorized by the articles of incorporation," then cumulative voting for directors is allowed. The articles of incorporation of Greene Group, Inc., never provided for cumulative voting for directors. The by-laws provided for cumulative voting, but not the articles of incorporation. The by-laws were amended to conform to the articles of incorporation and § 10-2A-53(d). The plaintiffs never had this right, so how can we hold that the trial court was plainly and palpably wrong in not finding that the removal of cumulative voting was evidence of a "squeeze out."
*500 The majority stockholder defendants "voted a raise for Bryant, Phelps, and May in 1987 which was a marked increase from previous years."
After hearing the evidence of experts, the trial court set retroactive compensation and compensation for the year 1987. In its final judgment, the trial court wrote:
"The Court finds from the undisputed evidence at trial that the salaries of the individual defendants, Bryant, Phelps and May for the year 1987 were set by the Board of Directors of Greene Group, Inc. The Court further finds from the undisputed evidence that defendants, Bryant, Phelps and May did not participate in any way in the decision made by the Board of Directors of Greene Group, Inc. The 1987 salaries were set by the Board of Directors of Greene Group, Inc. in reliance upon the opinion of an expert especially employed by Greene Group, Inc. Such employment was a good faith effort on the part of the Board of Directors of Greene Group, Inc. to set reasonable salaries for Bryant, Phelps and May. However, the Board of Directors of Greene Group, Inc. did not consider reasonable compensation for past services rendered by defendants, Bryant, Phelps and May to Greene Group, Inc. This Court is of the opinion that to allow plaintiffs to benefit from such services without compensating defendants, Bryant, Phelps and May for their management skill and expertise would be unequitable and unjust."
These findings are supported by the evidence, particularly the testimony of Dr. Clyde Scott of the School of Business of the University of Alabama. The trial court did not plainly and palpably err in finding that this was not evidence of a "squeeze out."
The majority finds that the trial court plainly and palpably erred in not finding that the majority stockholder defendants had squeezed out the minority stockholder plaintiffs by having "cancelled the minority stockholders' right to use the recreational farm, Thisildu, in Greene County."
I do not believe that this would in and of itself support an action based on an alleged "squeeze out"; however, there was evidence that the minority stockholders' right to use the farm was not "cancelled," but that a new procedure was implemented to allow the corporation to know who was using this farm. I cannot hold that the trial court plainly and palpably erred in not finding that this was evidence of a squeeze out.
The majority finds that the cancellation of the preemptive rights of stockholders is evidence of a squeeze out. This applied to the majority stockholder defendants, who owned over 81% of the capital stock, as well as to the minority stockholder plaintiffs, who owned less than 19% of the capital stock. What the minority was denied, the majority was denied. The percentage of ownership remains the same, and I find no evidence of a cash flow problem that will require the sale of additional capital stock. We should not reverse the trial court for failure to hold that this constituted a "squeeze out."
The majority holds that the trial court plainly and palpably erred in not finding that there was a squeeze out of the minority stockholder plaintiffs.[13] This Court found that there was a usurpation of a *501 corporate opportunity in Macon County, in Banks v. Bryant, supra. Justice Almon and I disagreed, and my dissent, concurred in by Justice Almon, appears at 497 So.2d at 465. However, in the case at issue, the majority stockholder defendants, in accordance with the reasoning of the majority in Banks v. Bryant, supra, admitted usurpation of corporate opportunities and the trial court fashioned a remedy for that. The minority stockholder plaintiffs should not receive more than the remedy that the trial court has given them for this. Therefore, I cannot hold that the trial court plainly and palpably erred in not also finding that the usurpation of a corporate opportunity entitled the minority stockholder plaintiffs to an additional remedy for "squeeze out."
I am aware of the theorists who advocate renegotiation of the legal contract between a corporation, its stockholders, and its management to reflect the perceived separation between ownership of corporate stock and control of the corporate entity. A.A. Beale and G.C. Means, The Modern Corporation and Private Property (1932); A. Chayes, The Modern Corporation and The Rule of Law in The Corporation in Modern Society (1959); E.S. Herman, Corporate Control, Corporate Power (1981); and R.B. Stevenson, Jr., Corporation and Information (1980). This is a move to have management, not the majority of the stockholders, control the corporate entity. As I understand their argument, it is that the modern stockholder is not an owner of the corporate entity but a rentier ("a man of independent means"; a "holder of an annuity"; or one who "has a small private income ... a small investor," Cassell's French-English English-French Dictionary 639 (Rev. ed. 1981)), who has no rights other than a satisfactory return on his investment and the right to liquidity. I do not subscribe to that legal theory. I subscribe to what I believe is the traditional theory of corporate law, for I view the corporate relationship as one in which the stockholders, as owners of the corporation, control the corporation through their voting power. The majority of the stockholders elect the board of directors and approve fundamental corporate transactions.
In the case at issue, we are not confronted with management of a corporation versus a majority of the stockholders of that corporation. Management is composed of the majority of the stockholders (over 81% of the stockholders); and the actions of the majority of stockholders/management is challenged by the holders of less than 19% of the common stock. Thus, we face the "Madisonian dilemma" in a corporate setting. What rights do minority stockholders have against the majority stockholders who are management? In my opinion, controlling stockholders owe a duty to minority stockholders not "`to eliminate minority shareholders or to deprive them of their proportionate rights and powers without a just equivalent'" and not to arbitrarily deprive them of their "`legitimate expectations.' "Burt v. Burt Boiler Works, Inc., supra. I do not find that the majority stockholder defendants in this case breached that duty; and, therefore, I cannot hold that the trial court was plainly and palpably wrong in finding that the majority stockholder defendants did not eliminate the minority stockholders' rights or powers without a just equivalent and did not arbitrarily deprive the minority stockholders of their legitimate expectations. Any expectations of more than the minority stockholder plaintiffs have received are great expectations beyond legitimacy.

Attorney Fees
Is the attorney fee of $905,603.00 and expense reimbursement of $61,719.31 set by the trial court unreasonable and inadequate as a matter of law? I have reviewed the briefs and the pertinent parts of the record. I have examined the nature of the attorney/client fee and expense arrangement initially entered into by the minority stockholder plaintiffs and their most competent attorney. I have read that attorney's testimony and the testimony of other attorneys concerning the reasonableness of an attorney fee in this case. I have studied Peebles v. Miley, 439 So.2d 137 (Ala.1983); Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala.1985); and Blum v. Stenson, 465 U.S. 886, 104 *502 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Should we apply the common fund doctrine? I question this because of the fee arrangement between the attorneys and the minority stockholder plaintiffs, who were to guarantee payment to the attorneys of certain fees and expenses and be reimbursed if the attorney fees and expenses were paid out of the fund recovered. However, for purposes of this dissent, I will assume that we should apply the common fund doctrine. To me, it is relevant where the common fund came from (100% from the majority stockholder defendants or corporations owned by them) and who benefits from the common fund (in percentage of ownership, the minority stockholder plaintiffs benefit less than 19% and the majority stockholder defendants, from whom 100% of the common fund came, benefit more than 81%).
Considering all of this, did the trial court abuse its discretion in awarding attorney fees to the minority stockholder plaintiffs? I cannot hold that it did, and there is nothing in the majority opinion that in any way changes my mind on this issue.
ALMON, J., concurs.
STEAGALL, Justice (concurring in part and dissenting in part).
I concur with the majority as to part I.
I concur with the majority in that portion of part II that affirms the trial court's judgment as to loan fees; I dissent from that portion remanding the question of retroactive salaries. I agree with the trial court in its holding that it would be inequitable and unjust not to compensate the majority stockholders for their efforts in creating these opportunities for the corporation. I do not believe the trial court was plainly and palpably wrong on this issue.
I dissent as to part III. I agree with the trial court in its holding as to interest due the minority stockholder. I think the only meaningful way to arrive at an equitable decision on interest due is to consider after-tax dollars. I believe the trial court has properly balanced the equities between the parties in this regard.
I dissent as to part IV. I agreed with the majority in Banks v. Bryant, 497 So.2d 460 (Ala.1986), because I felt that the Macon County transaction was a corporate opportunity. As a result of that decision, the majority stockholders have replaced those funds and included the Iowa opportunity; now they are also required to pay interest and attorney fees. To reverse the finding of the trier of fact on this issue goes too far, in my opinion. I simply cannot agree that minority stockholders who have received substantive dividends and have seen the value of their stock increase approximately eighteen thousand per cent in 10 years are being squeezed out. The phenomenal growth of this activity is, in my opinion, due to the expertise and unique skills of the managers and majority stockholders of this corporation. I would not substitute my judgment for that of the trial court on this sensitive, critical factual issue.
I concur in that portion of part V that affirms the decision of the trial court as to the attorney fees for counsel for the majority. I dissent as to that portion that reverses the award of attorney fees for minority counsel. The trial court heard extensive testimony on the question of attorney fees and, in my opinion, its decision is supported by the evidence.
The standard of review in a case in which the evidence has been presented ore tenus is well settled:
"This Court cannot overturn that finding of fact by the lower court unless the decision is unsupported by the evidence, and is plainly and palpably erroneous. Further, the presumption of correctness exists even though there may be conflicting evidence."
Kershaw v. Knox Kershaw, Inc., 523 So.2d 351, 356 (Ala.1988) (citations omitted). Here, the trial judge heard conflicting evidence on which reasonable minds could differ. The trial court's findings must, therefore, be "presumed to be a reasonable inference drawn from the evidence." Id. I believe that the trial court's decision was supported by the evidence and that it was not plainly and palpably erroneous.
*503 I, therefore, concur in part and respectfully dissent in part.

ON APPLICATION FOR REHEARING
PER CURIAM.
OPINION MODIFIED; APPLICATION OVERRULED.
MADDOX, JONES, SHORES, ADAMS and KENNEDY, JJ., concur.
ALMON, HOUSTON and STEAGALL, JJ., concur in part and dissent in part.
NOTES
[1] The present minority stockholders are: Bradley Brown, Jr.; Phillip B.M. Banks; William W. Humphries; J.E. McCampbell; A.R. and Estelle Taylor; and Vesta L. Smith.
[2] A pre-trial conference was held on February 3, 1987, and the trial judge issued his pre-trial order on May 29, 1987, which states at page 7-8 as follows: "Counsel for defendants have represented to the Court that they consider the precedent established by the opinion of the Supreme Court of Alabama in the Banks case to be controlling upon the litigation in the Brown case. In the Brown case, counsel for defendants have further advised the Court that pursuant to the Banks precedent, all funds received by the corporate defendant, AIM, Inc., and the individual defendants, Bryant, Phelps, and May, and claimed by the plaintiffs in the Brown case, have been paid over to Greene Group, Inc. with the exception of loan enhancement fees and an origination fee to which the defendants, Bryant, Phelps, and May claim entitlement because of the nature of such fees."
[3] $640,000 66.667%
Phelps $213,333 22.222%
May $106,667 11.111%
__________________________
Total $960,000 100%

[4] $133,333 66.667%
Phelps $ 44,444 22.222%
May $ 22,223 11.111%
__________________________
Total $200,000 100%

[5] Retroactive Salaries Sought from Greene Group, Inc.:
 1984 1985 1986
 Paid Sought Paid Sought Paid Sought
Bryant $200,000 $ 700,000 $200,000 $ 750,000 $200,000 $ 800,000
Phelps -0- $ 225,000 -0- $ 230,000 -0- $ 250,000
May -0- $ 135,000 -0- $ 142,500 -0- $ 150,000
____________________________________________________________________________________
Total $200,000 $1,060,000 $200,000 $1,122,500 $200,000 $1,200,000
Excess Claimed $ 860,000 $ 922,500 $1,000,000
Total Excess Salary Claimed $2,782,500

[6] Salaries Set by Order of September 21, 1988:
 1984 1985 1986 1987
Bryant $400,000 $400,000 $625,000 $625,000
Phelps $ 80,000 $ 80,000 $175,000 $175,000
May $ 55,000 $ 55,000 $120,000 $120,000
 ________ ________ ________ ________
 $535,000 $535,000 $920,000 $920,000

[7] The minority contests the "fairness" of this price.
[8] Value of shares (at $4,583 per share) as of December 31, 1986:

Name No. Shares Purchase Price Value of Stock
P. Banks 200 $5,000 $916,600
Wm. Humphries 100 $2,500 $458,300
B. Brown 200 $5,000 $916,600
A. Taylor 350 $8,750 $1,604,050
E. Taylor 350 $8,750 $1,604,050
V. Smith 200 $5,000 $916,600
J.E. Campbell 80 $2,000 $366,640

[9] At the board of directors meeting on March 26, 1985, Banks, the only minority director, was removed, and no minority stockholder has served since that date.
[10] 1983 1984 1985 1986 1987
Bryant $200,000 $200,000 $200,000 $200,000 $800,000
Phelps -0- -0- -0- -0- $250,000
May -0- -0- -0- -0- $150,000
Windham $ 73,942 $ 96,057 $105,000 $119,652 $118,000
Bradshaw $ 45,000 $ 48,307 $ 52,500 $ 57,192 $ 46,154
 ___________________________________________________________
Total $318,942 $344,364 $357,500 $379,728 $1,364,154

[11] The board of directors of Greene Group, Inc., on November 10, 1987, passed a resolution to amend Article IV of the Articles of Incorporation, as follows:

"No holder of the stock of any class of the Corporation shall have the preemptive right to purchase his proportion of the issuance of any class of shares including treasury shares of the Corporation."
[12] Attributed to Matthew Henry, 1662-1714.
[13] The majority opinion directs the trial court on remand to determine whether the majority's decisions were made for the purpose of squeezing out the minority. The trial court has made that determination. The trial court specifically found that the majority had "at all times acted in good faith," and "[is] not now and [has] not at any time in the past been guilty of fraud, willful negligence, malice, or bad faith."

Upon motion under Rule 59, A.R.Civ.P., to alter, amend, or vacate the final order and to consider, among other claims, the "tort of `squeeze out,'" the trial court held a hearing that was consented to by the parties; and, thereafter, it entered an order specifically addressing certain claims and then held that the court had carefully considered the other claims, evidence, and exhibits presented by the minority stockholder/plaintiffs, and after such consideration found that they were entitled to no relief. I consider this an adjudication on the claim of "squeeze out"; therefore, for the majority of this Court to remand as to this issue, it must have found that the trial court plainly and palpably erred.