719 So.2d 824 (1997)
LAWYERS SURETY CORPORATION
v.
Steve S. WHITEHEAD and Debra S. Whitehead, as successor conservators of the estates of Christopher R. Stanton and Ashley Lynn Stanton, minors.
2960065.
Court of Civil Appeals of Alabama.
March 28, 1997.
Rehearing Denied May 9, 1997.
*826 Joseph S. Johnston and Robert B. Stewart of Johnston, Wilkins & Druhan, Mobile, for appellant.
Ralph G. Holberg III of Holberg & Holberg, P.C., Mobile, for appellees.
ROBERTSON, Presiding Judge.
Lawyers Surety Corporation appeals from the judgment of the Mobile County Probate Court in favor of Steve S. Whitehead and Debra S. Whitehead, as conservators of the estates of Christopher R. Stanton and Ashley Lynn Stanton, minors ("the estates" of "Christopher" and "Ashley"), which judgment (1) awarded the sums of $23,270.47 and $20,351.27 for losses to the estates of Christopher and Ashley, respectively; and (2) directed Lawyers Surety to pay $1,650 in attorney fees to counsel for the Whiteheads and $650 in fees to Christopher and Ashley's guardian ad litem. We affirm.
On January 4, 1989, Floyd Stanton ("Floyd"), Christopher and Ashley's paternal grandfather, petitioned the probate court under the Alabama Uniform Guardianship and Protective Proceedings Act ("the Act"), Ala. Code 1975, § 26-2A-1 et seq., for the issuance of letters of conservatorship over the estates. At the time, Floyd alleged that each estate consisted of proceeds of approximately $400,000. The probate court granted the petitions, and Floyd filed bonds in both cases, naming himself as principal and Lawyers Surety as surety, which bonds state that Floyd and Lawyers Surety "are held and firmly bound unto the Judge of [Probate] ... in the sum of ... $440,000 ... conditioned that [Floyd] shall well and truly, faithfully perform all the duties required of him under said appointment."
During his conservatorship, Floyd purchased four parcels of real property. Three of these parcels are located in Robertsdale, Alabama, and one is in Las Cruces, New Mexico. It is undisputed that Floyd utilized funds from the estates in purchasing these properties, and it is also undisputed that title to these parcels was taken not in the name of the estates, nor in Christopher and Ashley's individual names, but in Floyd's individual name.
On August 18, 1992, Floyd tendered his resignation as conservator of the estates and requested that Thomas E. Bryant, Jr., the general guardian and conservator of Mobile County, be appointed as successor conservator of the estates.[1] The probate court accepted Floyd's resignation and appointed Bryant as successor conservator. Soon afterwards, the Whiteheads filed petitions seeking an accounting from Floyd and appointment as successor conservators over the estates. Although these motions were not immediately acted upon, the probate court granted the Whiteheads' subsequent motion to compel production of "all ... writings pertaining to [Floyd's] office as Conservator of the [estates]."
The probate court then set the Whiteheads' motions for appointment and accounting for hearing, and Lawyers Surety was served with notice. Soon thereafter, Bryant filed estate inventories, and on June 4, 1993, he requested authority to sell Christopher and Ashley's one-half interests in realty located on Wilters Street in Robertsdale, Alabama ("the Wilters Street property"), which had been purchased by Floyd. Attached as an exhibit to the petition to sell the Wilters Street property was a partially executed buy-sell agreement from Carl W. Smith and Lynn W. Smith indicating that they would purchase the property for $61,000, contingent upon mortgage financing, with the seller to pay closing costs and other expenses. This petition was also set for hearing.
Floyd filed pro se petitions for final settlement of his conservatorship accounts on August 20, 1993. His petitions indicated that he had expended some $400,000 in "disbursements." The majority of these "disbursements" were for the purchases of the four parcels of real property in Robertsdale and Las Cruces, but were not so identified in the *827 petitions; in an exhibit to the petition filed in Ashley's case, Floyd indicated that Ashley's "1/2 interest in property (4) cost $137,500." Moreover, the exhibits to the petitions did not disclose any rents or income derived from real property. Lawyers Surety accepted service of the petitions for final settlement and waived "all further notice" in both proceedings.
Bryant, as conservator, then filed petitions to sell Christopher and Ashley's one-half interests in the three other parcels of real property, including a lot located on Cardinal Hills in Robertsdale ("the Cardinal Hills property").[2] Attached to these petitions were several exhibits, including an appraisal of the Wilters Street property at $61,000 and an appraisal of the Cardinal Hills property at $36,000. Bryant indicated in the petitions that he had received an offer to purchase the Cardinal Hills property for $36,900, and the attached buy-sell agreement showed that Bryant, as the seller, had agreed to pay various expenses, as well as a five percent commission to Ryan Realty. The probate court issued two orders on January 18, 1994, authorizing Bryant to sell Christopher and Ashley's interests in the Wilters Street property and the Cardinal Hills property "at public or private sale" and "subject to confirmation."
Nine days later, the Whiteheads moved in both cases for a partial summary judgment in their favor against Floyd and against Lawyers Surety on its bonds. These motions were supported by the Whiteheads' affidavits and the affidavits of a certified public accountant. Among other things, the Whiteheads' motions noted that Floyd had obtained no rents or income as a result of his purchase of real property with conservatorship funds, and alleged that the estates had in fact suffered economic losses from the purchase of the real property. The Whiteheads' motions posited that not only had the estates lost the funds used by Floyd to purchase the real property (to the extent that these were not recovered through sale of the properties) and those sums expended for upkeep of the real property, but the estates had also lost an imputed rate of return of six percent on all monies expended by Floyd in the purchase and maintenance of the real property. The Whiteheads asked that partial summary judgments be immediately entered for all apparent losses to the conservatorship estates that could be attributed to Floyd's conduct, subject to recalculation upon the sale of the estates' remaining real property holdings. Although the probate court denied these motions, it reset all pending matters for resolution on July 26, 1994.
On the day set for the hearing, John Joseph Bell (as next friend and parent of his two minor children) was permitted to intervene in Christopher and Ashley's conservatorship cases for the purpose of protecting his own children's claimed interest in the estates' real property. Bell alleged that the deeds transferring the property to the estates were invalid because, he contended, a prior judgment against Floyd in his individual capacity had been entered in favor of Bell's minor children.
Also on July 26, 1994, counsel for Floyd and for the Whiteheads entered into a stipulation in open court. Floyd agreed on the record (1) that he should have obtained an effective rate of return of at least six percent on all conservatorship funds; (2) that the funds he had constructively delivered to Bryant included the net proceeds, if any, ultimately derived from the sale of the real property at issue; and (3) that the difference between the sums delivered to Bryant as successor conservator and those that ought to have been delivered would have been the result of actions, expenditures, investments, and administration on Floyd's part not authorized by statute, by law, or by court order.
After this stipulation had been transcribed and made a part of the record, the Whiteheads submitted motions for, among other things, "conditional" judgments against Floyd and Lawyers Surety in both cases for the funds lost to the estates as a result of Floyd's purchase of the Wilters Street property and the Cardinal Hills property. The judgments sought by the Whiteheads were to be "conditioned on the absence of recovery to the Estate[s] of the value of the two parcels *828 of real property," that is, the Wilters Street property and the Cardinal Hills property, which were then encumbered by a claimed judgment lien in favor of Bell in an amount exceeding the properties' market values. The probate court thereafter entered judgments in Christopher and Ashley's cases against Floyd and Lawyers Surety for $54,912 and $52,480, respectively, but declared that these judgments were to be made final only "on motion of a party in interest and after notice and an opportunity to be heard."
Bryant subsequently sold the Wilters Avenue property for $55,300 (less closing costs) to Carl W. Smith and Lynn M. Smith, who had leased the property from Bryant for several months pursuant to an agreement whereby Bryant agreed to apply the Smiths' $350 monthly rental payments toward the purchase price. Although the Cardinal Hills property was originally contracted to be sold to David Mann and Donna Mann in July 1993 for $36,900, it was eventually sold to the listing real estate agent, John Ryan, and Lola J. Ryan in December 1994 for the same base purchase price less a credit of $4,750 representing prior rental payments made by the Manns. Evidence at the August 27, 1996, hearing in the probate court indicates that there were no offers to purchase the property other than from the Ryans, despite local advertisement and signage on the property. On behalf of the estates, Bryant paid a brokerage commission to Ryan Realty for its services connected with both transactions. The total amount of cash received from the sales of the Wilters Street property and the Cardinal Hills property ($80,002.75) was paid into court in a pending deed reformation action in the Baldwin County Circuit Court, and was ultimately awarded to the estates over the objections of Bell in May 1996, along with the interest earned thereupon.
After the proceeds from the sale of the Robertsdale properties and the interest thereupon had been disbursed to the estates, the Whiteheads (who had been appointed successor conservators in September 1995) moved for the entry of a final judgment against Floyd and Lawyers Surety based upon the conditional judgment entered in December 1994, and for other relief to which they were entitled. Lawyers Surety opposed the motion, alleging that any shortfall from the sales of the Wilters Street property and the Cardinal Hills property was not attributable to Floyd's misfeasance or malfeasance, but to Bryant's misconduct in selling the lots, for which it contended it was not legally responsible. The probate court held a hearing, received oral and written evidence, and entered judgments in favor of the Whiteheads as successor conservators and against Floyd and Lawyers Surety. The probate court also awarded fees to counsel for the Whiteheads and to Christopher and Ashley's guardian ad litem, to be paid by Lawyers Surety. Finally, the probate court directed the entry of final judgment under Rule 54(b), Ala.R.Civ.P.[3]
Lawyers Surety appeals. We have jurisdiction based upon the amount in controversy, which is less than $50,000 exclusive of interest and costs. Ala.Code 1975, § 12-3-10.
Lawyers Surety asserts that its relationship with Floyd as surety is a contractual one, and that it did not agree to assume liability for the acts or omissions of Bryant in recovering less than the purchase prices of the Cardinal Hills property and the Wilters Street property that had been paid by Floyd. However, while we agree that suretyship may as a general matter be considered to constitute a contractual relationship, Lawyers Surety nevertheless agreed to be bound as a surety to the probate judge for any loss sustained by the estates as a result of Floyd's failure to perform properly his duties as conservator. Moreover, by agreeing to be bound as surety for Floyd under the Act, Lawyers Surety necessarily agreed to be held "jointly and severally liable with" Floyd. See Ala.Code 1975, § 26-2A-140(a)(1) (specifying requirements and provisions applicable to any bond required of conservators by probate court). Finally, the Whiteheads, who are Christopher and Ashley's mother and adoptive father, constitute persons "interested" under the Act in the administration of *829 their children's conservatorship estates such that they could institute proceedings against Lawyers Surety for breach of Floyd's obligations to discharge faithfully all duties of the conservatorships according to law. Id. §§ 26-2A-139(a), 26-2A140(a)(3).
We now consider whether Floyd (and therefore Lawyers Surety, who agreed to joint and several liability) can be held liable for the losses to the estates that Lawyers Surety attributes to Bryant, the successor conservator. We note that Floyd's conductusing the estates' funds to purchase property, then taking title in his individual nameis not controverted by the parties. Nor is the standard of care that Floyd owed susceptible to dispute: a conservator appointed under the Act "shall observe the standards in dealing with the estate of the protected person that would be observed by a prudent person dealing with the property of another," that is, the standard of care and performance otherwise applicable to trustees in Alabama. See Ala.Code 1975, § 26-2A-145, and Code commentary thereto.
Under the law of trusts, a "trustee is under a duty to the beneficiary to keep the trust property separate from his individual property ... and to see that the property is designated as property of the trust." Restatement (Second) of Trusts § 179 (1959); accord, First Nat'l Bank of Birmingham v. Basham, 238 Ala. 500, 505, 191 So. 873, 877 (1939) (trustee who takes and holds title to trust property in his or her own name is chargeable with a breach of trust). The rationale behind this rule has been stated as follows:
"The reasons for this strict rule of equity are not difficult to understand. If a trustee is permitted to hold the trust res just as he holds his individual property, he may be subjected to a strong temptation to take the trust property for himself and allocate to the trust one of his own less advantageous pieces of property....
"The fundamental idea of the trust is equitable ownership in specific and definite property, tangible or intangible. If the trust property is not identified by the trustee, great difficulties are placed in the way of the beneficiary if he is obliged to go into equity to get enforcement. He has the burden of tracing the trust res into the assets of the defaulting trustee.... In order that the beneficiary not be required to face such problems in tracing the property in which he has an equitable interest, and for the purpose of enabling him to get the benefit of that property quickly and easily, the trustee is required to act in such a way that the trust ownership of the property in question will at all times be clearly apparent....
"The holding of trust property without any appearance of its connection with the trust also makes it possible for creditors of the trustee to be misled into thinking that the trust assets are part of the trustee's personal estate, and could lead to efforts on the part of such creditors to take the trust res in satisfaction of the personal debts of the trustee. These attacks by creditors may be unsuccessful but they are apt to involve the beneficiary in much trouble and expense."
8 George G. Bogert & George T. Bogert, The Law on Trusts & Trustees, § 596 at p. 445 (Rev.2d ed. 1980). Indeed, Bell made exactly such an attack on the conservatorships' ownership of the Wilters Street property and the Cardinal Hills property in this case, albeit an unsuccessful one. We readily conclude that Floyd's conduct, for which Lawyers Surety must answer, constituted a breach of trust under the Act.
While the Restatement (Second) of Trusts declares that a trustee is not necessarily liable for any loss resulting from the making of an investment that is not properly earmarked as a trust investment, he or she will be held liable "in a situation where as a matter of policy an absolute liability is imposed... in order to deter [the trustee] from committing such a breach of trust." Restatement (Second) of Trusts § 205 comment f (1961). For example:
"The trustee is liable for the loss where he has taken securities in his own name in order that he may subsequently be in a position where he may claim the securities as his own if they go up in value and claim that they are held by him as trustee if they *830 go down in value. He is liable for the loss even though he had no such purpose in mind, as long as his failure to earmark puts him in a position where it would be easy for him to make similar claims."
Id. Thus, we must consider whether Alabama law, as a policy matter, imposes upon a conservator absolute liability for losses incurred by a conservatorship estate with respect to an investment when he or she takes title to the investment in his or her own name and not as conservator.
Our review of Alabama caselaw indicates that our Supreme Court has indeed adopted a rule of absolute liability for losses incurred by an investment which is ostensibly made on behalf of a protected person's estate but whose title is held by the fiduciary in his or her individual capacity. In Chancellor v. Chancellor, 177 Ala. 44, 58 So. 423 (1912), an administrator of a decedent's estate petitioning in probate court for final settlement received a credit for a sum he had deposited in a bank that subsequently failed, although the evidence revealed he actually had made the deposit in his individual capacity. The Alabama Supreme Court reversed, holding that "[w]here an administrator or trustee, with trust funds in his hands, deposits them in his own name in a bank or other institution which fails, the loss should fall on him," and "his liability will not depend upon the good faith, prudence, or judgment with which apparently he may have acted, nor upon the fact that he may have disposed of his own funds in the same way." 177 Ala. at 46-47, 58 So. at 424. The Chancellor court concluded:
"Having for his personal convenience, or from whatever motive, deposited the money in his own name, thereby vesting himself with a legal title, it follows as a necessary consequence, when a loss occurs, he will not be permitted to say, as against his cestui que trust, that the fact is not as he voluntarily made it appear.... [T]he authorities agree that a trustee who either invests or deposits trust money in his own name, without in some way designating it as trust property, will be responsible for any loss that may occur to the fund while so invested or deposited."
Id. at 48, 49, 58 So. at 424 (emphasis added).
To like effect is Barnes v. Clark, 227 Ala. 651, 151 So. 586 (1933), which noted the applicability of the foregoing rule to a ward's guardian, an office similar to that held in this case by Floyd as conservator. The Barnes court first noted that it was "firmly committed to the proposition that a guardian may make temporary deposits of trust funds in a responsible bank, acting in good faith and with discretion, and will not be held to liability for such funds" if the bank later fails. 227 Ala. at 652, 151 So. at 587. However, the court continued:
"Of course, to come within the protection of the above-stated rule, the guardian must not deposit the funds in his own name, nor commingle the account with his own in the bank, for, if he does, his liability will become absolute, and he cannot escape liability by reason of good faith, prudence, or judgment, nor upon the fact that he may have disposed of his own funds in the same way."
Id. (emphasis added). This rule of absolute liability, which gives the beneficiary the privilege of repudiating an investment held without trust label, has been called a "very salutary" one by a leading treatise on trust law. Bogert & Bogert, supra, § 596 at p. 449.
As Barnes and Chancellor reveal, Alabama has imposed absolute liability upon conservators for losses incurred by an investment when title is taken in the conservator's personal capacity and not as trustee. Thus, in deciding this appeal, we need not address Lawyers Surety's contention that Bryant breached his duties of trust in the process of selling the estates' respective one-half interests in the Cardinal Hills property and the Wilters Street property, for Floyd's (and therefore Lawyers Surety's derivative) liability for losses from the two properties is absolute under the circumstances of this case. The dissenting opinion would limit the scope of the rule of absolute liability set forth in Chancellor, supra (and applied in the guardianship context in Barnes, supra), to only those instances wherein a trustee invests trust funds in his own name in a bank *831 which subsequently fails. There is nothing in the words of the Chancellor rule"a trustee who ... invests ... trust money in his own name ... will be responsible for any loss that may occur"which indicates that our supreme court intended that it be so limited. Indeed, in the specific context of land purchases, our supreme court has enforced an absolute duty of reimbursement:
"When an agent employs the money or property of his principal in the purchase of lands, without the knowledge or consent of the latter, taking the title in his own name or in the name of a third person, at the election of the principal he may be made personally liable, or the money may be followed into the land, and a lien asserted on the land for the reimbursement of the principal, or a trust of the legal estate will result by implication of law."
Long v. King, 117 Ala. 423, 428-29, 23 So. 534, 535 (1898) (emphasis added); accord, Adams v. Griffin, 253 Ala. 371, 374, 45 So.2d 22, 25 (1949) (where trustee uses, without consent, funds belonging to the cestui que trust to purchase land and took title in his own name, the cestui may claim the property itself or charge the property with payment of the money). Floyd's appropriation of his grandchildren's funds to buy land for himself is thus precisely the evil condemned in Chancellor and Barnes, and this court will not forbid innocent beneficiaries from fully recouping the losses they sustained because of his illicit land purchases by allowing Lawyers Surety to point a finger at Floyd's successor conservator.
In this case, the probate court properly found that Floyd's purchase of the Wilters Street property and the Cardinal Hills property resulted in losses to the estates, both of a direct nature (in that the properties netted less than their purchase price when resold) and of a consequential nature (in that the funds used to purchase the realty did not earn interest during the period that the land was owned by the estates), and properly held Floyd and Lawyers Surety responsible for these losses. "In Alabama, a court of equity is authorized to mold its decree so as to adjust the equities of the parties and meet the necessities of each situation.... When a trustee makes an investment that is improper, it is equitable for the court to put the parties in the position they would have occupied except for the breach of trust." First Alabama Bank of Montgomery, N.A. v. Martin, 425 So.2d 415, 429 (Ala. 1982) (citations omitted), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). We therefore affirm the probate court's award of damages.[4]
Lawyers Surety also contends that it should not have been directed to pay $1,650 in attorney fees to the Whiteheads' counsel, citing Alabama authority to the effect that attorney fees are recoverable "only where authorized by statute, when provided in a contract, or by special equity." E.g., Eagerton v. Williams, 433 So.2d 436, 450 (Ala. 1983). The Whiteheads, in response, contend that their counsel's services were necessary to restore the estates to the position they would have occupied absent Floyd's conduct, and thus that those services were of benefit to the estates. Our review of the probate court's attorney fee award is limited to determining whether the probate court abused its discretion. See Troy Bank & Trust Co. v. Brantley, 263 Ala. 428, 438, 82 So.2d 618, 627 (1955).
We agree with the Whiteheads that their recovery of losses for the benefit of the estates constitutes a "special equity" that has been recognized in Alabama as a valid ground for an award of attorney fees to them as prevailing parties. See Farlow v. Adams, 474 So.2d 53, 59 (Ala.1985) (when the contentions of a party in litigation are in the interest of and for the benefit of the entire trust estate, courts will award costs and attorneys' fees from the trust estate to the party benefiting the trust estate).[5]
*832 Moreover, we find no error in the taxation of these costs to Lawyers Surety rather than the estates. As our Supreme Court stated in directing assessment of attorney fees against the trustee of an express trust, "[t]he allowance of counsel fees and litigation expenses is within the discretion of the court. Generally, where an allowance is made, to whom it is made, and who pays it, depend upon factors such as who benefits from the litigation, the outcome of the litigation, and the necessity for the litigation." Reynolds v. First Alabama Bank, 471 So.2d 1238, 1244 (Ala.1985) (emphasis added). This inherent equitable discretion to assess attorney fees directly against a party supplements the power of the probate court to award such fees out of conservatorship estates under § 26-2A-142(a), Ala.Code 1975. See Ala.Code 1975, § 26-2A-3. In this case, the successful efforts of the Whiteheads and their counsel resulted in the estates being made whole; moreover, absent Floyd's breach of trust and his subsequent failure to account for these losses completely, there would have been no need whatsoever for litigation to compel him to make restitution for the losses. Under these circumstances, the probate court could have concluded that it would be unjust for the two minor children to absorb the costs of compelling their former conservator to remedy the losses chargeable to him. Consequently, the probate court did not abuse its discretion in applying the so-called "special equity" exception to the general rule barring recovery of attorney fees as costs in a civil action.
Finally, with regard to the taxation of costs for the guardian ad litem against Lawyers Surety, we note that Rule 17(d) of the Alabama Rules of Civil Procedure[6] provides that "[i]n all cases in which a guardian ad litem is required, the court must ascertain a reasonable fee or compensation to be allowed and paid to such guardian ad litem for services rendered in such cause, to be taxed as a part of the costs in such action" (emphasis added). "[T]he usual rule is to tax the costs in favor of the prevailing party ... which, if applied to this case, would have called for taxing all of the costs against appellant," Lawyers Surety. Merchants Nat'l Bank v. Cowley, 265 Ala. 125, 135, 89 So.2d 616, 625 (1956); accord, Ala.R.Civ.P. 54(d). We find no error here.
We affirm the judgment of the probate court. The Whiteheads' motion for attorney fees on appeal is granted in the amount of $1,500.
AFFIRMED.
YATES, MONROE, and THOMPSON, JJ., concur.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
In this case, the conservatorship estates suffered losses. Some of the losses were attributable to the actions of Floyd, the first conservator, in taking title to properties in his own name, and some of the losses were, apparently, attributable to the actions of Bryant, the second conservator, in not properly selling the properties. The majority, however, holds:
"[W]e need not address Lawyers Surety's contention that Bryant breached his duties of trust in the process of selling the estates' respective one-half interests in the Cardinal Hills property and Wilters Street property, for Floyd's (and therefore Lawyers Surety's derivative) liability for losses from the two properties is absolute under the circumstances of this case."
The majority places the responsibility for all the losses on the surety for the first conservator because, it holds, that result is dictated by the "absolute liability" rule set out in § 205 of the Restatement (Second) of Trusts and applied in Barnes and Chancellor, supra. I must respectfully dissent.
Section 205 of the Restatement provides, in pertinent part, that "[i]f the trustee commits a breach of trust, he is chargeable with any loss or depreciation in value of the trust estate resulting from the breach of trust." (Emphasis added.) Comment f to § 205 states:
"Loss not resulting from breach of trust. As is stated in Clause (a), a trustee is liable for a loss resulting from the breach *833 of trust. A question may arise, therefore, as to the causal connection between the breach of trust and the loss. If the trustee commits a breach of trust and if a loss is incurred, the trustee may not be chargeable with the amount of the loss if it would have occurred in the absence of a breach of trust.
"Where a trustee has committed a breach of trust in failing to earmark a trust investment, he is not necessarily liable for a loss resulting from the making of the investment. He is not liable where the loss did not result from the failure to earmark, except in a situation where as a matter of policy an absolute liability is imposed upon the trustee in order to deter him from committing such a breach of trust."
(Emphasis added.) Comment f to § 205 recognizes the general rule that, in order to charge a trustee with a loss to the trust estate, there must be a causal connection between the trustee's conduct and the loss. See Estate of Stetson, 463 Pa. 64, 83, 345 A.2d 679, 690 (1975)("It is generally the rule that a trustee who breaches a fiduciary duty will not be surcharged for a loss sustained by the trust if there is no causal connection between the breach of duty and the loss").
Comment f goes on to discuss the "absolute liability" exception to the general rule that is sometimes imposed as a matter of public policy. Relying on Barnes and Chancellor, supra, the majority applies the "absolute liability" exception to a situation it was not intended to cover. Barnes and Chancellor present the following question: Who should bear the loss resulting from the failure of a bank in which trust funds have been deposited? Those two cases provide the following answer: The trustee will bear the loss only if he has failed to earmark and segregate the trust funds. The theory of liability in Barnes and Chancellor is that, as between the trustee and the bank, neither of which, in the strict sense, "caused" the loss, the trusteewho has a fiduciary duty to the estateshould bear the loss if he has breached that duty.
This case does not present the same facts as Barnes and Chancellor, and it should not, therefore, be decided on the same theory as Barnes and Chancellor. Here, there are two fiduciaries. Each had duties to the estate, and each, apparently, breached some of his duties. There is no reason in this case, as there was in Barnes and Chancellor, to assign all the losses to one fiduciary (and his surety) when the causal connection between the losses and the conduct of each fiduciary can be determined.[7] Compare Constantine v. United States Fidelity & Guar. Co., 545 So.2d 750 (Ala.1989)(wherein the court held that a notary's surety is not liable for the notary's wrongful notarization of a mortgage if the mortgagor's own negligence caused the loss).
I would hold that the responsibility for the losses to the conservatorship estate should be determined based on the causal connection between those losses and the actions of each conservator. Any other result could discourage surety companies from writing fiduciary bonds in Alabama.
NOTES
[1] The resignation was filed on Floyd's behalf by an attorney from Bryant's law firm.
[2] The two other parcels addressed in these petitions are not an issue in this case.
[3] The Rules of Civil Procedure apply in cases in the Mobile County Probate Court pertaining to the administration of minors' estates. See Ala. Acts 1991, Act No. 91-131, § 1.
[4] Because Lawyers Surety asserts no challenges to the award of damages other than to deny legal responsibility, we do not reach the issue whether the probate court's calculation of damages was proper. Boshell v. Keith, 418 So.2d 89 (Ala. 1982) (issues not argued by appellant will not be considered).
[5] While we acknowledge that McCallie v. McCallie, 660 So.2d 584 (Ala.1995), reversed a fee award assessed against a party who sought appointment as a conservator, we note that in that case (unlike this present case), no conservatorship estate ever came into being that could have benefited by litigation or from which an award could have been made.
[6] See note 3 regarding the applicability of the Rules of Civil Procedure in this case.
[7] The current conservators' argument in their brief that "[the second conservator] ultimately must account for rental and other moneys received during his conservatorship, matters which will be addressed in his (and his surety's) accounting" recognizes that the losses are capable of being apportioned.